COCA–COLA BOTTLING COMPANY OF SHREVEPORT, INC., et al., Plaintiffs,

v.

The COCA–COLA COMPANY, a Delaware corporation, Defendant.

ALEXANDRIA COCA–COLA BOTTLING COMPANY, LTD., et al., Plaintiffs,

v.

The COCA–COLA COMPANY, Defendant.

Civ. A. Nos. 83–120, 83–95MMS.

United States District Court, D. Delaware.

Aug. 20, 1985.

Edmund N. Carpenter, II, Charles F. Richards, Jr., and Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant and Jane F. Vehko, Bondurant, Stephenson & Smith, Atlanta, Ga., Miles J. Alexander and Jerre B. Swan, Kilpatrick & Cody, Atlanta, Ga., Charles S. Weems, Gold, Little, Simon, Weems & Bruser, Alexandria, La., J. Barry Epperson, Epperson, Goodpaster & Johnson, Tulsa, Okl., Roger N. Nanovic, Jim Thorpe, Pa., of counsel), for plaintiffs.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Frank C. Jones, Michael C. Russ and George S. Branch, King & Spalding, Atlanta, Ga., Jerome Gilson, Willian Brinks Olds Hofer Gilson & Lione Ltd., Chicago, Ill., of counsel), for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

The complete formula for Coca-Cola is one of the best-kept trade secrets in the world. Although most of the ingredients are public knowledge, *see Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 563 F.Supp. 1122, 1132 (D.Del.1983), the ingredient that gives Coca-Cola its distinctive taste is a secret combination of flavoring oils and ingredients known as "Merchandise 7X." The formula for Merchandise 7X has been tightly guarded since Coca-Cola was first invented and is known by only two persons within The Coca-Cola Company ("the Company"). The only written record of the secret formula is kept in a security vault at the Trust Company Bank in Atlanta, Georgia, which can only be opened upon a resolution from the Company's Board of Directors.

The impregnable barriers which the Company has erected to protect its valuable trade secret are now threatened by pretrial discovery requests in two connected cases before this Court. Plaintiffs in these lawsuits are bottlers of Coca-Cola products who seek declaratory, injunctive and monetary relief against the Company based upon allegations of breach of contract, violation of two 1921 Consent Decrees, trademark infringement, dilution of trademark value, and violation of federal antitrust laws, all of which allegedly occurred when the Company introduced diet Coke in 1982. Stripped to bare essentials, the plaintiffs' contention is that the Company is obligated to sell them the syrup used in the bottling of diet Coke under the terms of their existing contracts covering the syrup used in the bottling of Coca-Cola. The primary issue arising from this contention is whether the contractual term "Coca-Cola Bottler's Syrup" includes the syrup used to make diet Coke. Plaintiffs contend that in order to prevail on this issue, they need to

discover the complete formula, including the secret ingredients, for Coca-Cola, as well as the complete formulae, also secret, for diet Coke and other Coca-Cola soft drinks. Accordingly, plaintiffs have filed a motion to compel production of the complete formulae under Fed.R.Civ.P. 37(a). Defendant, which has resisted disclosure of its secret formulae at every turn, contests the relevance of the complete formulae to the instant litigation and avers that disclosure of the secret formulae would cause great damage to the Company.

The issue squarely presented by plaintiffs' motion to compel is whether plaintiffs' need for the secret formulae outweighs defendant's need for protection of its trade secrets. In considering this dispute, I am well aware of the fact that disclosure of trade secrets in litigation, even with the use of an appropriate protective order, could "become by indirection the means of ruining an honest and profitable enterprise." 8 J. Wigmore, *Evidence* § 2212, at 155 (McNaughton rev. 1961). Moreover, I am also aware that an order compelling disclosure of the Company's secret formulae could be a bludgeon in the hands of plaintiffs to force a favorable settlement. On the other hand, unless defendant is required to respond to plaintiffs' discovery, plaintiffs will be unable to learn whether defendant has done them a wrong. *Grasselli Chemical Co. v. National Aniline & Chemical Co.,* 282 Fed. 379, 381 (S.D.N.Y.1920) (L. Hand, J.). Except for a few privileged matters, nothing is sacred in civil litigation; even the legendary barriers erected by The Coca-Cola Company to keep its formulae from the world must fall if the formulae are needed to allow plaintiffs and the Court to determine the truth in these disputes.

## I. *Factual Background*

The history of The Coca-Cola Company and its bottlers has been set forth at length in earlier opinions in these cases, *see Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.,* 563 F.Supp. 1122, 1124–29 (D.Del.1983) ("Preliminary Injunction Opin-

ion"); *Alexandria Coca-Cola Bottling Co. v. Coca-Cola Co.,* No. 83–120, slip op. at 2–13 (D.Del. Aug. 14, 1984) ("Summary Judgment Opinion"), and that history does not bear repeating here. Instead, only a brief description of these two cases is warranted in order to establish the issues involved.

Since the turn of the century, Coca-Cola has been produced in a two-stage process: the Company manufactures "Coca-Cola Bottler's Syrup" ("Bottler's Syrup") and sells it to bottlers, who add carbonated water to the syrup and place the resulting product in bottles and cans. In 1921, following litigation between bottler groups and the Company concerning their contracts for Bottler's Syrup, the Company entered into Consent Decrees which established certain contractual terms between the Company and its bottlers. The Consent Decrees provided, *inter alia:* first, that Coca-Cola Bottler's Syrup contain no less than 5.32 pounds of sugar per gallon; second, that bottlers would pay a maximum of $1.30 per gallon for the syrup; third, that the price of Bottler's Syrup could increase based upon the increase in the market price of sugar as quoted quarterly by the ten largest refiners in the United States. Until 1978, the price of Bottler's Syrup for virtually all bottlers was governed by the price formula established by the 1921 Consent Decrees.

Beginning in 1978, due to inflationary pressures and declining sales, the Company sought price relief from the existing price formula in its contracts with bottlers. After negotiations, most of the bottlers agreed to an amendment ("the 1978 Amendment") to their contracts in exchange for a clause requiring the Company to pass on any cost savings if the Company decided to substitute a lower cost sweetener for granulated sugar. The 1978 Amendment established a new price formula for Bottler's Syrup which utilizes a "sugar element," a "base element," and the Consumer Price Index. The sugar element provides for adjustments based on the quoted market price of any sweetening ingredient used in Bottler's Syrup. The great majori-

ty of the bottlers, representing approximately 90 percent of domestic sales, have signed the 1978 Amendment. These bottlers are generally known as the "amended bottlers." The remaining bottlers, known as the "unamended bottlers," refused to sign the amendment and continue to operate under Bottler's Contracts which basically conform to the contracts entered into after the 1921 Consent Decrees. In 1980, the amended bottlers began obtaining some benefit from the 1978 Amendment when the Company decided to substitute high fructose corn syrup ("HFCS–55"), a less expensive sweetener than granulated sugar, for approximately 50 percent of the granulated sugar in Bottler's Syrup.

On July 8, 1982, the Company introduced diet Coke to the market with great fanfare. The name was chosen carefully and focused on the descriptive nature of the word "diet" and the tremendous market recognition of "Coke." The advertising emphasized the taste of the new cola and its relationship to Coke. The public response to diet Coke has been phenomenal—in just three years, it has become the third largest selling soft drink in the United States and the best-selling diet soft drink in the world.

The introduction of diet Coke immediately gave rise to a dispute between Coke bottlers and the Company over what price bottlers must pay for diet Coke syrup. The Company took the position that diet Coke was not within the scope of the existing contracts, and a new contract term with flexible pricing would have to be developed. Many of the bottlers—both amended and unamended—believed that the Company was obligated to provide diet Coke under the terms of their existing Bottler's Contracts for Coca-Cola. This dispute led to the filing of these lawsuits in early 1983.

Since that time, there have been two significant and widely-publicized changes in Coca-Cola. First, in April, 1985, the Com-

pany announced that it would stop producing Coca-Cola under the existing formula ("old Coke") and immediately start producing "new" Coke, which, the Company proclaims, tastes even better than old Coke. According to the promotional materials that accompanied the announcement of new Coke, the formula for new Coke was derived from the research that led to the development of diet Coke.[1] The secret ingredient in new Coke, called "7X–100," is different than the secret ingredient in old Coke, but it is still only known to a handful of individuals and is kept locked in a bank vault in Georgia.

The second significant change came when the Company, in response to consumer demand, announced in July, 1985, that it would bring back old Coke under the name "Coca-Cola Classic." The Company will now provide bottlers with two kinds of sugar-sweetened cola syrups—old Coke syrup, to be packaged as Coca-Cola Classic, and new Coke syrup. The Company has informed its bottlers that for the present, it will supply them with Coca-Cola Classic syrup under the terms of their contracts for Coca-Cola, but without prejudicing the Company's rights. Dyson Affidavit, Docket Item ("Dkt.") 168 (83–120).[2] As defendant's supplemental brief makes clear, the Company is ostensibly reserving the right to decide at a later time that the syrup for Coca-Cola Classic is not Coca-Cola Bottler's Syrup, even though the identical syrup was considered Coca-Cola Bottler's Syrup a few months ago. The merits of this remarkable position, however, are not before the Court at this time.

## II. *Plaintiffs' Motion to Compel*

After extensive discovery, plaintiffs filed the instant motion that, in essence, seeks to compel the Company to produce the complete formulae, including secret ingredients, for Coca-Cola, diet Coke, caffeine free

---

1. Although promotional materials are not reliable sources of facts, this fact is stated repeatedly in the materials and was not controverted by defendant at oral argument. *See* Transcript of May 8, 1985 Hearing ("Tr.") at 108.

2. Docket Items in Civil Action No. 83–95 will be cited as "Dkt. ____." Docket Items in Civil Action No. 83–120 will be cited as "Dkt. ____ (83–120)."

Coca-Cola, caffeine free diet Coke, TAB, and every experimental cola formula developed and tested by the Company for possible marketing under the Coca-Cola or Coke trademarks.[3] Defendant's responses to the discovery requests at issue, which plaintiffs filed as an appendix to their motion, demonstrate that defendant has objected to plaintiffs' discovery wherever it approached matters related to the secret formulae. Thus, plaintiffs have been foreclosed both from learning the formulae themselves and from learning about other matters that relate to the formulae.

In support of their motion to compel, plaintiffs have contended that the secret formulae are relevant and necessary to prove their contentions and respond to defendant's argument that Coca-Cola and diet Coke are two different products. In response, the Company denies that the formulae are relevant and essential to resolve the central issues in these cases, and also contends that disclosure of these trade secrets is inappropriate at this stage of the litigation. On May 8, 1985, the Court heard extensive oral argument on these issues and received evidence concerning the introduction of new Coke. At the hearing, the Court explored with the parties the possibility of resolving the formula discovery issues by a suitable stipulation, which would obviate the need for the Company to disclose its secrets. A stipulation that the secret ingredients in diet Coke and Coke are identical was used to avoid the disclosure of the secret formulae at the preliminary injunction stage, but plaintiffs indicated at the hearing that the same stipulation was no longer acceptable, in part because it is not true. After the hearing, the parties conducted extensive negotiations on the formula issue but were unable to resolve it by stipulation. In addition, the parties were granted an opportunity to file supplemental submissions on the significance of the Company's decision to reintroduce old Coke as Coca-Cola Classic. Thus,

the discoverability of the secret formulae is squarely presented and ripe for decision.

### A. The Legal Standard Applicable to Discovery of Trade Secrets

■ It is well established that trade secrets are not absolutely privileged from discovery in litigation. See, e.g., Federal Open Market Committee v. Merrill, 443 U.S. 340, 362, 99 S.Ct. 2800, 2813, 61 L.Ed.2d 587 (1979); Centurion Industries, Inc. v. Warren Steurer & Associates, 665 F.2d 323, 325 (10th Cir.1981); Pennwalt Corp. v. Plough, Inc., 85 F.R.D. 257, 259 (D.Del.1979). In order to resist discovery of a trade secret, a party must first demonstrate by competent evidence that the information sought through discovery is a trade secret and that disclosure of the secret might be harmful. Centurion Industries, 665 F.2d at 325; 8 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2043, at 301 (1970). If this showing is made, "the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action." Centurion Industries, 665 F.2d at 325; see Pennwalt Corp. v. Plough, Inc., 85 F.R.D. at 259; Struthers Scientific & International Corp. v. General Foods Corp., 51 F.R.D. 149, 154 (D.Del.1970); National Utility Service, Inc. v. Northwestern Steel & Wire Co., 426 F.2d 222, 227 (7th Cir.1970); Hartley Pen Co. v. United States District Court, 287 F.2d 324, 328 (9th Cir.1961); Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 998 (10th Cir.), cert. denied, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); Kleinerman v. United States Postal Service, 100 F.R.D. 66, 69 (D.Mass.1983); see generally Annot., 17 A.L.R.2d 383 (1951) (collecting cases); 4 J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 26.60[4], at 26–211 (2d ed. 1984); 8 C. Wright & A. Miller, supra, § 2043 at 301; 2 R. Milgrim, Trade Secrets § 7.06[1][a]

---

**3.** Plaintiffs also sought to compel more complete answers to certain interrogatories and requests for admission, which did not involve trade secrets. The parties informed the Court by letter that they have agreed on a resolution of those outstanding discovery requests, leaving only the formulae discovery issues remaining for decision.

(1984). When disclosure of trade secrets is sought during discovery, the governing relevance standard that the movant must satisfy is the broad relevance standard applicable to pre-trial discovery, i.e., the movant must show that the material sought is relevant to the subject matter of the lawsuit. *See Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. at 259; *Centurion Industries*, 665 F.2d at 326; 8 C. Wright & A. Miller, *supra*, § 2043 at 304; 2 R. Milgrim, *supra*, § 7.06[1][b]. The level of necessity that must be shown is that the information must be necessary for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories. *See Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. at 259; *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d at 999; *Hartley Pen Co. v. United States District Court*, 287 F.2d at 328–30; *United States v. An Article of Drug Consisting of 30 Individually Cartoned Jars*, 43 F.R.D. 181, 189 (D.Del.1967).

■ Once relevancy and need have been established, the Court must balance the need for the information against the injury that would ensue if disclosure is ordered. *Federal Open Market Committee v. Merrill*, 443 U.S. at 362, 99 S.Ct. at 2813; *Centurion Industries*, 665 F.2d at 325; *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d at 999; *Kleinerman*, 100 F.R.D. at 69. Because protective orders are available to limit the extent to which disclosure is made, the relevant injury to be weighed in the balance is not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order. In this regard, it is presumed that disclosure to a party who is not in competition with the holder of the trade secret will be less harmful than disclosure to a competitor. *See United States v. United Fruit Co.*, 410 F.2d 553, 556 (5th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969); 2 R. Milgrim, *supra*, § 7.06[1][b], at 7–88.

The balance between the need for information and the need for protection against the injury caused by disclosure is tilted in favor of disclosure once relevance and necessity have been shown. As the Supreme Court has recognized, "orders forbidding any disclosure of trade secrets or confidential commercial information are rare." *Federal Open Market Committee v. Merrill*, 443 U.S. at 362 n. 24, 99 S.Ct. at 2813 n. 24; *see also Morrison-Knudsen Co. v. Department of Army*, 595 F.Supp. 352, 355 (D.D.C.1984), *aff'd mem.*, 762 F.2d 138 (D.C.Cir.1985). A survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary. *See, e.g., Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. at 259; *Struthers Scientific & Industrial Corp. v. General Foods Corp.*, 51 F.R.D. at 154; *United States v. An Article of Drug*, 43 F.R.D. at 189; *Centurion Industries*, 665 F.2d at 326; *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d at 999; *Kleinerman v. United States Postal Service*, 100 F.R.D. at 69–70; *Davis v. General Motors Corp.*, 64 F.R.D. 420, 422 (N.D.Ill.1974); *Maritime Cinema Service Corp. v. Movies En Route, Inc.*, 60 F.R.D. 587, 590 (S.D.N.Y. 1973); *Spartanics, Ltd. v. Dynetics Engineering Corp.*, 54 F.R.D. 524, 526 (N.D.Ill. 1972); *cf. Cleo Wrap Corp. v. Elsner Engineering Works, Inc.*, 59 F.R.D. 386, 388 (M.D.Pa.1972) (discovery denied where relevance slight, need small, and harm great). The reason for allowing the discovery of trade secrets whenever they are needed to advance the just adjudication of a lawsuit is simple: in the absence of an applicable privilege, "[j]udicial inquiry should not be unduly hampered." *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d at 999. As Judge Learned Hand stated in one of the earliest trade secret cases:

It is true that the result may be to compel the defendant to disclose [trade secrets], and that that may damage the defendant ... That is, however, an inevitable incident to any inquiry in such a case; unless the defendant may be made to answer, the plaintiff is deprived of its right to learn whether the defendant has done it a wrong.

*Grasselli Chemical Corp. v. National Aniline & Chemical Co.*, 282 Fed. 379, 381 (S.D.N.Y.1920).

### B. *The Coca-Cola Formulae Are Trade Secrets*

To satisfy its burden of proving that the Coca-Cola formulae qualify for trade secret protection, defendant has submitted the affidavit of Robert A. Keller, Senior Vice President and General Counsel of the Company. Dkt. 197. According to the Keller affidavit, the Company has taken every precaution to prevent disclosure of the formula for "Merchandise 7X," the secret ingredient in old Coke. The written version of the secret formula is kept in a security vault at the Trust Company Bank in Atlanta, and that vault can only be opened by a resolution from the Company's Board of Directors. It is the Company's policy that only two persons in the Company shall know the formula at any one time, and that only those persons may oversee the actual preparation of Merchandise 7X. The Company refuses to allow the identity of those persons to be disclosed or to allow those persons to fly on the same airplane at the same time. The same precautions are taken regarding the secret formulae of the Company's other cola drinks—diet Coke, caffeine free diet Coke, TAB, caffeine free TAB, and caffeine free Coca-Cola. The secret formula for each drink is only known to three or four persons in the Company. Similar precautions attend the experimental formulae sought by plaintiffs.

The Keller affidavit further states that these secret formulae are highly valued assets of the Company and have never been disclosed to persons outside the Company. As an indication of the value the Company places on its secret formulae, Keller avers that the Company elected to forego producing Coca-Cola in India, a potential market of 550 million persons, because the Indian government required the Company to disclose the secret formula for Coca-Cola as a condition of doing business there. The affidavit concludes by stating that because of intense competition in the soft drink industry, the disclosure of any information reflecting the formulae or the Company's research and development would be extremely damaging to the Company.

New Coke was introduced after the Keller affidavit was filed, but the materials supplied to the Court about new Coke provide information about the secret formula in new Coke. To develop new Coke, Merchandise 7X was "optimized," i.e., changed, and the new secret ingredient is called "7X–100," to commemorate the one hundredth year of Coca-Cola. This is the first change in the secret ingredient in Coca-Cola since the invention of Coke in 1886. According to the Company's promotional materials, "7X–100 is just as much a secret as 7X and will be kept in a locked vault in the Trust Company of Georgia Bank in Atlanta." Plaintiffs' Exhibit 9, May 8, 1985 Hearing, at 2. The formula for caffeine free Coke has also been changed and is presumably still subject to the same safeguards.

 Although some of the mystique surrounding the Coca-Cola formulae is the creation of marketing hype, it is beyond dispute that, behind the hype, the Company possesses trade secrets which have been carefully safeguarded and which are extremely valuable. It is also evident that any disclosure of those trade secrets would be harmful to the Company. Accordingly, I find that defendant's secret formulae are trade secrets and subject to the maximum protection that the law, as set forth above, allows.

### C. *Relevance and Necessity of the Formulae*

 Plaintiffs contend that discovery of these secret formulae is required because they are relevant and necessary to the presentation of plaintiffs' case. In order to determine whether these trade secrets are in fact relevant and necessary, a review of the issues in the two cases is warranted.

#### 1. *Unamended Bottlers*

The unamended bottlers claim that defendant must furnish diet Coke syrup to

them pursuant to the terms of their Bottler's Contracts and the 1921 Consent Decrees. The standard form contract for unamended bottlers states, in pertinent part: "COMPANY agrees to furnish to BOTTLER ... sufficient syrup for bottling purposes to meet the requirements of BOTTLER in the territory herein described.... COMPANY does hereby select BOTTLER as its sole and exclusive customer and licensee for the purpose of bottling the Bottlers' bottle syrup, COCA–COLA, in the territory herein described." Dkt. 1, Exh. J, at 2. The contract further provides that "BOTTLER agrees ... [t]o bottle COCA–COLA in the following manner: to have it thoroughly carbonated, put in bottles, using one ounce of Bottlers' Coca-Cola syrup in a standard bottle for Coca-Cola ... decorated with the name Coca-Cola in the characteristic script...." *Id.* The terms "bottle syrup" and "Bottlers' Coca-Cola syrup" are not defined in the contract.

Plaintiffs contend that the terms "Bottlers' Coca-Cola syrup" and "bottle syrup" include any syrups manufactured by the Company for the purpose of providing any packaged soft drink sold under the names "Coca-Cola" or "Coke," including diet Coke. Dkt. 224, at 2–3. In addition, plaintiffs allege that Coca-Cola and diet Coke are just two versions of the same product, except that one is sweetened with caloric sweeteners and the other with non-caloric sweeteners. Defendant's response to these contentions has been that only syrup for sugar-sweetened Coca-Cola is covered by the unamended bottlers' contracts, and that diet Coke and Coca-Cola are two separate products.[4]

### 2. *Amended Bottlers*

The amended bottlers rely on different contractual language to argue that the Company must furnish them diet Coke syrup on the same terms as Coca-Cola syrup. The 1978 Amendment, which all of the amended bottlers signed, replaced the pricing formula used for the unamended bottlers with one that was tied to the "Sugar Element," a term defined in the contract. The Amendment then provides: "In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient." Dkt. 1 (83–120), Exh. A–4, ¶ 1(c). The amended bottlers have contended that "another sweetening ingredient" includes saccharin or aspartame, the sweeteners that the Company has used in diet Coke.

The Company argues that this contractual language is inapplicable because diet Coke is a new and different product and is not modified Coca-Cola. Plaintiffs' response is that diet Coke is "simply a version of a product which has undergone evolutionary change but which retains its identity as Coke," and "that any differences between Coke and diet Coke Bottler's Syrup are either insignificant or reflect attempts to achieve taste identity." 563 F.Supp. at 1130.[5] On plaintiffs' motion for preliminary injunction, the Court conducted an extensive analysis of the product identi-

---

**4.** On plaintiff's motion for a preliminary injunction, this Court determined that the contractual phrase "Bottler's Coca-Cola Syrup" is not likely to include diet Coke Syrup. Because that finding was made in the preliminary injunction context, it is not a final decision on the merits and does not preclude plaintiffs from proving at trial that diet Coke syrup is encompassed by the 1921 contracts.

**5.** Plaintiffs did not press this theory on their motion for summary judgment, presumably because this theory raises factual issues which

would not have been amenable to summary judgment. Defendant has alleged that plaintiffs' failure to argue their product identity theory constitutes an abandonment of that theory. This argument lacks force. A party is free to press a different theory in support of a summary judgment motion than it uses at trial. Moreover, it is noteworthy that the Company pursued the question of product identity at the summary judgment stage and created a significant record in support of its contentions. *See* Summary Judgment Opinion at 17 n. 35.

ty question, including a comparison of the publicly-disclosed ingredients of diet Coke and Coca-Cola, before concluding that "for at least some purposes diet Coke may be Coke." *Id.* at 1134.

### 3. *Relevancy of the Secret Ingredients*

A major issue common to both actions is whether diet Coke and Coca-Cola are the same product. The Company's primary defense has been that Coca-Cola and diet Coke are two separate and distinct products. Plaintiffs contend that the complete formulae for diet Coke and Coca-Cola would be relevant to rebut this defense by showing that the two colas share common attributes and that any differences between the two are insignificant and merely reflect attempts to achieve taste identity. With the introduction of new Coke, plaintiffs argue that because new Coke was derived in part from the secret formula for diet Coke, it may be true that new Coke is more like diet Coke than new Coke is like old Coke. In response, defendant argues that except for the difference in sweeteners, ingredient similarities and differences are not relevant to the determination of whether diet Coke and Coca-Cola are the same product. Instead, defendant relies upon the difference in taste, different essential characteristics of the beverages, different consumer markets for the beverages, and different consumer perceptions of the beverages.

Defendant's response is unavailing. When this Court previously addressed the merits of this litigation in the context of a motion for preliminary injunction, the first issue addressed was whether Coke and diet Coke are two versions of the same product. Although the parties' contentions have evolved in the intervening two years, the issue of product identity remains a part of these lawsuits. *See* Plaintiffs' Preliminary Statement Of Issues, Dkt. 223, at 2–10; Defendant's Preliminary Statement Of Issues, Dkt. 223, at 2–5. Although defendant has attempted to define the issues so that the only relevant ingredient is the sweetener, all the ingredients are relevant to determine whether the two colas are the same product. In fact, the secret ingredients may be the most relevant ones because the secret ingredients are what gives these drinks their distinctive tastes.

Plaintiffs could use the secret formulae to prove one of several product identity theories. An analysis of the secret ingredients in diet Coke and old Coke might show that diet Coke was designed to taste as much like old Coke as a low calorie cola could, and that any differences in secret ingredients reflect defendant's attempts to achieve taste identity. Alternatively, plaintiffs might use the secret formulae for diet Coke, old Coke, and new Coke in the following way: The syrup for old Coke and new Coke have both been sold as Coca-Cola Bottler's Syrup by the Company. It has been publicly disclosed, however, that the formula for new Coke was derived from the research used for diet Coke. If plaintiffs, armed with the complete formulae, can show that diet Coke is very similar to new Coke, and that diet Coke is more like new Coke than new Coke is like old Coke, that fact could tend to show that diet Coke is within the range of syrups that have been sold as Coca-Cola Bottler's Syrup. These examples, based only on speculation as to what plaintiffs might learn through discovery, illustrate that the complete formulae for diet Coke, old Coca-Cola, and new Coca-Cola are relevant to one of the primary issues in this litigation—product identity. The complete formulae, once known, will tend to make a disputed fact more (or less) likely: that, for purposes of this litigation, diet Coke syrup is Bottler's Syrup.

The complete formula for caffeine free Coca-Cola is not as directly relevant. Plaintiffs elicited deposition testimony from Dr. Anton Amon, the Company's Technical Director, that regular Coca-Cola and caffeine free Coca-Cola are the same product, despite the fact that Coca-Cola has, and caffeine free Coke does not have, kola nut extract (from which the term "cola" is derived), vanilla extract, and caffeine. *See* Tr. at 16. Plaintiffs contend that the complete caffeine free Coke for-

mula is relevant to the product identity issue, because a comparison of the formulae for diet Coke, regular Coke, and caffeine free Coke might show that diet Coke is more similar to regular Coke than is caffeine free Coke. Plaintiffs could then link that finding to Dr. Amon's statement to argue that diet Coke is therefore the same product as Coke.

In response, defendant points out that plaintiffs and defendant have signed letter agreements which allow caffeine free Coke syrup to be priced and supplied on the same terms as regular Coke syrup, but which state that this agreement would not prejudice either side in litigation. This response is a non sequitur. The letter agreements do not foreclose plaintiffs from arguing caffeine free Coke and regular Coke are similar products; they only prevent plaintiffs from using the letter agreements themselves as an admission that they are the same product. Plaintiffs' ability to use Dr. Amon's testimony to their advantage is simply not affected by the letter agreements. Moreover, the reasons offered by plaintiffs demonstrate that the complete formula for caffeine free Coke is relevant to the product identity issue in conjunction with the testimony of Dr. Amon.[6]

The relevance of the complete formula of TAB is more difficult to accept. Plaintiffs contend that the TAB formula is relevant to show defendant's motivations and objectives in formulating diet Coke. As an example, plaintiffs state that analysis might show that diet Coke was based on the Coke formula rather than the TAB formula. However, even if that proposition is true, it does little to show that diet Coke is covered by the contracts. The fact that diet Coke is more like Coke than like TAB does not tend to show that diet Coke and Coke are the same product. Although plaintiffs have discussed the TAB and caffeine free Coke formulae in the same breath, they are clearly different, for the relevancy of the caffeine free Coke formula is based on Dr. Amon's testimony, and plaintiffs have no similar admission regarding TAB. It follows that the TAB formula is not relevant to this litigation and need not be disclosed.[7]

Finally, plaintiffs seek the formulae and test data for experimental colas which were developed and tested by the Company but never marketed. To the extent that plaintiffs seek the formulae and related information for *low-calorie* colas developed by the Company that were based on the Coke formula or were directly or indirectly related to the development of diet Coke, the information they seek is relevant. This information relates to the motivations and intent of the Company in its development of diet Coke, and may show whether, as defendant has contended through an expert, the Company could have made a diet cola that tastes more like regular Coke than does diet Coke. Comparison of the experimental low-calorie colas with diet Coke and regular Coke would show why the Company chose the diet Coke formula over other available alternatives. If the Company chose the formula most like Coke, that tends to show the Company's intent to have diet Coke taste just like Coke. In addition, plaintiffs have discovered that the Company tested a low-calorie cola in 1978, which bears on the intent and understanding of the Company in signing the 1978 Amendment. The formula of that cola is certainly relevant.

### 4. *Necessity of Discovery of This Information*

As in most disputes over the discoverability of trade secrets, *see* cases cited at page

---

6. The parties did not brief or argue the discoverability of the formula for caffeine free diet Coke. The relevance of this formula is not self-evident—plaintiffs have not cited an admission analogous to that of Dr. Amon which they could use for caffeine free diet Coke. Accordingly, discovery of the formula for caffeine free diet Coke will be denied, with leave to renew if plaintiffs can later make an appropriate showing.

7. This holding is limited to the discoverability of the TAB formula itself, as that is the only issue related to TAB that is addressed in the parties' briefs. Other aspects of TAB are mentioned in plaintiff's motion itself, without elaboration, and it is possible that other discovery relating to TAB might be relevant. Because issues aside from the formula were not briefed or argued, the Court declines to address them at this time.

292–293 *supra*, the necessity of the discovery of the complete formulae follows logically from the determination that the formulae are relevant. Plaintiffs need the complete formulae in order to address the product identity issue by comparing the ingredients of the various soft drinks involved. Plaintiffs cannot respond to the assertions of defendant's experts that diet Coke and Coca-Cola are two products unless plaintiffs' experts can analyze the complete formulae and explain why the products are the same.[8] Merely using the publicly-disclosed ingredients is obviously insufficient, because they would present an incomplete picture, and because the secret ingredients are the key to the taste of Coca-Cola. The differences in the public ingredients, including sweeteners, cannot be understood unless they are put in context through disclosure of the similarities and differences in the secret ingredients. Without the complete formulae, plaintiffs will be foreclosed from presenting all the relevant evidence in support of their position.

In addition, plaintiffs need the complete formulae in order to explore on cross-examination the bases for the opinions of Company witnesses that Coca-Cola and diet Coke are two separate products. As plaintiffs' counsel stated at oral argument, *see* Tr. at 124–25, plaintiffs' cross-examination of defendant's witnesses has been foreclosed by defendant's objections that plaintiffs' questions relate to trade secrets. Plaintiffs cannot be expected to discover the truth without full cross-examination. Moreover, the formula information is not available from any other source, and no adequate substitute exists for this information. It follows that discovery of the complete formulae is necessary.

After the hearing, defendant attempted to remove the necessity for the information by offering to stipulate that the secret ingredients in old Coke, new Coke and diet Coke are identical. Defendant contends that this result is the most favorable set of facts that plaintiffs could hope to find through discovery. It is evident, however, that the actual formulae could be more favorable to plaintiffs than this stipulation. For example, if the secret ingredients in new Coke and diet Coke are very similar but different than the secret ingredients in old Coke, that would favor plaintiffs, as indicated above. On the other hand, discovery may show that the secret ingredients in old Coke were modified to make diet Coke, and that those modifications were intended to counterbalance the taste change caused by substituting artificial sweeteners for sugar. The effect of the secret ingredient change may have been to cancel out the changes in other ingredients and make diet Coke taste like Coke. Further, defendant's proposed stipulation does not reveal the number of ingredients that are secret ingredients. If the secret ingredients in Coke and diet Coke are composed of the same 100 ingredients, so that the vast majority of all the ingredients in the two colas are identical, that fact would be more favorable to plaintiffs than if the secret ingredients were only a few in number. Finally, defendant's proposed stipulation does not solve the problem of plaintiffs being foreclosed from full cross-examination by defendant's assertion of trade secret privilege. In sum, defendant's proposed stipulation is not as favorable to plaintiffs as discovery might be and does not remove the necessity for disclosure.

#### 5. *Need Balanced Against Harm*

The final part of the test for discoverability of trade secrets is to balance the need for disclosure against the harm that would ensue from disclosure. The potential harm that would come from public disclosure of the formulae for old Coke, new Coke, diet Coke, and caffeine free Coke is great, *see*

---

8. Although the Company probably would not reveal its formulae to outside experts, some Company witnesses who know the formulae may testify. Given the Company's policy of not revealing the names of persons knowing the formulae, plaintiffs would not even be able to discover whether Company experts are basing their opinions on a comparison of the secret formulae.

Keller Affidavit at 6–7, but virtually all of that harm can be eliminated with stringent protective orders and other safeguards. Because plaintiffs are Coca-Cola bottlers, they will have an incentive to keep the formulae secret. The likelihood of harm is less than if defendant's trade secrets were disclosed in litigation to competitors. *See United States v. United Fruit Co.*, 410 F.2d 553, 556 (5th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969); 2 R. Milgrim, *Trade Secrets* § 7.06[1][b], at 7–88 (1984). The potential for harm from protected disclosure of the formulae for old Coke, new Coke, diet Coke, and caffeine free Coke is outweighed by the plaintiffs' need for the information. While plaintiffs' need for the experimental cola formulae is less strong, this lesser need is counterbalanced by the fact that the harm resulting from disclosure of these formulae would be less severe, because those colas have never been marketed and are less valuable trade secrets.

In sum, the product identity issue is important in these two cases, and analyses of the complete formulae will be a significant part of the proof on that issue. Plaintiffs' need for this information outweighs the harm that disclosure under protective order would cause. Disclosure will be ordered.

### D. *Propriety of Delaying Discovery Until Trial*

Defendant has also argued that the Court should not order disclosure at this stage of the case because the formulae are of secondary importance, and because it is not certain at present whether this information will be needed at trial. Defendant suggests postponing disclosure until trial, when the issues will be clarified, and implies that because this case will be tried without a jury, it would be feasible to postpone trial and conduct further discovery if formula discovery becomes indispensable. In support of its argument, defendant cites *Lever Brothers Co. v. Proctor & Gamble Manufacturing Co.*, 38 F.Supp. 680 (D.Md. 1941); *Hartley Pen Co. v. United States District Court*, 287 F.2d 324 (9th Cir.1961);

*Ray v. Allied Chemical Corp.*, 34 F.R.D. 456 (S.D.N.Y.1964); *DeLong Corp. v. Lucas*, 138 F.Supp. 805 (S.D.N.Y.1956); and *Cities Service Oil Co. v. Celanese Corp. of America*, 10 F.R.D. 458 (D.Del.1950).

The cases on which defendant relies are inapposite. In *Lever Brothers, supra*, on which defendant primarily relies, discovery was sought before defendant had filed its answer, and discovery was denied because the Court could not determine at that early stage whether the information plaintiff sought was relevant. *See Lever Brothers*, 38 F.Supp. at 683. In *Hartley Pen, supra*, the Ninth Circuit Court of Appeals reversed a district court disclosure order because movant had failed to demonstrate relevance and necessity. 287 F.2d at 331. The Ninth Circuit's statement that its decision would be without prejudice to the moving party's right at a later time to initiate discovery on trade secret information, *see id.* at 332, does not support deferral of discovery when relevance and need have been established. In both *DeLong Corp v. Lucas, supra,* and *Ray v. Allied Chemical Corp., supra,* the information was sought by competitors, and, at least in *Ray*, the court was unable to prevent disclosure of the trade secrets to the party-competitor. Finally, in *Cities Service Oil Co., supra*, Judge Rodney of this Court deferred acting on the motion only until the moving party had examined some new material produced by the defendant and informed the court whether further discovery would be necessary. 10 F.R.D. at 460.

More importantly, there is no good reason to delay discovery at this stage of these cases. The issues have already been developed through two years of discovery, preliminary injunction motions and, in one case, a summary judgment motion. These proceedings demonstrate that the product identity issue is important and will not become irrelevant at trial. Moreover, in an effort to move the case to trial in the foreseeable future, the parties at the direction of the Court have submitted preliminary statements of the issues which demonstrate that the formula information is

relevant. Further, given the magnitude of this case, it would be inefficient for the Court and the parties to prepare for trial, begin trial, and then adjourn for the lengthy period that would be required to take supplemental discovery. In short, postponing the disclosure of the formula information until trial is not supported by the case law and is not warranted in this situation, where relevance and need have been established.

### E. *Discovery of Certain Taste Test Results*

One additional discovery request has been briefed by the parties which requires discussion under a different analysis than that used above. Plaintiffs have sought, and defendant has resisted, discovery for the Company's taste tests between caffeine free Coke and regular Coke. As an initial matter, I fail to see how taste test data qualifies as trade secrets. In any event, because of Dr. Amon's testimony that caffeine free Coke and Coke are the same product, these data are relevant and necessary for plaintiff to explore the product identity issue. For example, if tests show that more consumers can detect differences between caffeine free Coke and Coke than can detect differences between diet Coke and Coke, that fact, coupled with Dr. Amon's testimony, would tend to show that diet Coke is the same product as Coke. This relevance and necessity outweighs the slight harm that would result if these test results were disclosed.

### IV. *Conclusion*

It has been held that defendant must disclose its complete formulae, including secret ingredients, for diet Coke, old Coke, new Coke, caffeine free Coke, and certain experimental low calorie colas, but not the formulae for TAB and caffeine free diet Coke. In addition, it has been held that defendant must disclose certain taste test results. Given the proprietary nature of the formula information, however, a more stringent protective order than the one currently in effect is warranted to prevent public disclosure of the formulae. For example, it may be advisable to limit the disclosure of the formulae to plaintiffs' trial counsel and independent experts. *See Federal Open Market Committee v. Merrill*, 443 U.S. 340, 362 n. 24, 99 S.Ct. 2800, 2813 n. 24, 61 L.Ed.2d 587 (1979); *Cone Mills Corp. v. Joseph Bancroft & Sons Co.*, 33 F.R.D. 318, 321–22 (D.Del.1963); *Scovill Manufacturing Co. v. Sunbeam Corp.*, 61 F.R.D. 598, 602 (D.Del.1973); *Davis v. General Motors Corp.*, 64 F.R.D. 420, 422 (N.D.Ill.1974). Because the parties have not addressed what additional protective measures would be satisfactory, the Court will not enter a new protective order at this time. Instead, the parties shall negotiate a protective order that both allows access to information and prevents disclosure of trade secrets. The parties shall submit that order within twenty days.