## MANNINGTON MILLS, INC. and Mannington Mills of Delaware, Inc., Plaintiffs,

v.

## ARMSTRONG WORLD INDUSTRIES, INC., Defendant.

### No. Civ.A. 00876–RRM(SLR)(MPT).

United States District Court, D. Delaware.

April 25, 2002.

---

Steven J. Balick, Ashby & Geddes, Wilmington, DE, for Plaintiffs.

Thomas A. Stevens, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for Armstrong World Industries, Inc.

Philip A. Rovner, Potter, Anderson & Corroon, LLP, Wilmington, DE, for Congoleum Corp.

## ORDER

THYNGE, United States Magistrate Judge.

Under consideration is nonparty Congoleum's, motion to quash the subpoena for documents issued by plaintiff, Mannington Mills (Mannington). Mannington served the extensive subpoena to obtain various documents from Congoleum relating to any and all contacts, discussions, understandings or agreements, whether written or oral, between Congoleum and defendant, Armstrong and Domco Tarkett (plaintiff in a declaratory judgment action against Mannington) and all of Congoleum's financial information relating to sales, market share, net profits/gross revenue, field and customer testing and information used in determining the success of products falling within the category of Dual Embossed Floor Covering, as well as resilient vinyl flooring from 1995 to the present. Further, the document requests are directed to both the '008 patent, which is the subject of this action and the '903 patent, a related patent which is presently not part of Mannington's claims in this matter.[1] *D.I. 111, Ex. 1.*

### Background:

Mannington instituted this patent action against Armstrong alleging infringement of its '008 patent, a patent covering products made using Mannington's Natureform process, which are products that generally fall within resilient sheet vinyl flooring and in particular, are included in Dual Embossed Floor Covering. The '008 patent issued on September 5, 2000. In a related case, 01–815–RRM(SLR), Mannington also has sued Armstrong under its '903 patent, which covers the Natureform process. That patent issued on October 5, 1999. In these cases, Armstrong has alleged invalidity defenses against the patents. In another matter, Domco Tarkett, a licensee of Mannington, instituted a declaratory judgment action against Mannington on the aforementioned patents.[2] *D.I. 197.* Congoleum is not a par-

---

1. Mannington has moved in a separate motion to consolidate this action with the other Armstrong matter involving the '903 patent. The declaratory judgment action with Domco Tarkett involves both the '008 and '903 patents. In recent discussions with the court regarding scheduling in the Domco Tarkett matter, Mannington has agreed that it "makes sense" to have a consolidated Markman hearing in all three actions.

2. These are three cases of which the court is aware that have been filed in this jurisdiction. Invalidity, but not infringement, is in issue in the Domco Tarkett matter, as are damages.

ty to any of these actions.

Congoleum is a competitor of Mannington, Armstrong and Domco Tarkett and likewise, is in the business of manufacturing and selling resilient sheet vinyl flooring, which includes floor covering products known as Dual Embossed Floor Covering.[3] Prior to the issuance of the subpoena in question, Armstrong took the depositions of certain present and former employees of Congoleum, all of whom responded to subpoenas, including Merrill Smith, a Senior Vice–President of Technology. *D.I. 112 n. 2; D.I. 191 at 10–11.*[4] The documents produced by Congoleum to Armstrong pursuant to those subpoenas had been previously produced to Mannington. They included some work on trial flooring, prior art documents, evidence of sales of the 1420 flooring and samples of that flooring as well. *D.I. 191 at 13.* The sample flooring produced to Mannington and subsequently to Armstrong, was resilient sheet vinyl flooring which included Congoleum floor products known as Concept/Reunion, Landscape/Earthtone and Classic Elegance/Mosaic Manor[5]. These products were subsequently examined by Mannington through visual inspection, and then microscopically, after which photographs of the cross-sections of the three samples were taken to view and measure certain properties of the products. *D.I. 124 ¶ 4–7.* Further, Mannington examined Congoleum's Futura sample as well via a similar process. *D.I. 124 ¶ 9.*[6] No testing beyond some form of visual observation occurred.

Congoleum filed its motion to quash, opening brief and affidavits on January 11, 2002. *D.I. 111, 112.* Mannington responded with its opposition brief and declarations in support thereof on or about January 24, 2002. *D.I. 123–126.* Thereafter, Congoleum filed its reply brief and another supporting declaration from Smith. *D.I. 127, 128.* On March 8, 2002, a telephone conference was held to address the issues and arguments made by Mannington and Congoleum concerning this motion. *D.I. 191.* This is the Court's decision and order on Congoleum's motion to quash.

**Congoleum's Arguments:**

Congoleum based its motion to quash on the following reasons:

1. The subpoena demands trade secrets and highly confidential information without any showing of need and without any adequate protective order. Any protective order in existence cannot adequately protect Congoleum since it is not a party to this action.

2. The subpoena is overbroad, is unduly burdensome, is time consuming and to comply with it will be expensive.

3. The subpoena requests irrelevant information because it seeks documents pertaining to a patent not in issue in this case (specifically, '903 patent) and requests documents concerning alleged "secondary considerations" in relation to obviousness of the '008 patent when no allegations of infringement have been made by or against Congoleum.

4. The subpoena seeks information protected by attorney/client privilege or attorney work product immunity.

5. The subpoena includes information presently in Mannington's possession, is obtainable from other sources, that are more

---

**3.** According to Mannington and Congoleum, these four companies are the major players in this market. *D.I. 191* at 24.

**4.** Armstrong's subpoena duces tecum was limited to correspondence from Mannington soliciting Congoleum to license these patents and representative documents *to be selected by Congoleum* relating to the existence of and product specifications of any sheet vinyl floor covering manufactured by it prior to February 20, 1997. *D.I. 111, Ex. 4* (emphasis added).

**5.** Although during oral argument, Mannington suggested cooperation between Armstrong and

Congoleum in support of its opposition to Congoleum's motion, any contact between Congoleum and Armstrong occurred after product samples, documents and prior art had been shared by Congoleum with Mannington, which, in turn, motivated Armstrong's subpoena to obtain like information from Congoleum. *D.I. 191 at 11–12.*

**6.** The examinations were performed by Dr. Hao A. Chen, Mannington's Director of R & D, who concluded that the Futura product was not prior art and therefore, did not invalidate the '008 patent and that the other three products read on this patent's claims. See *D.I. 124.*

convenient, less burdensome and less expensive.

In support of its motion, Congoleum filed two declarations from Merrill Smith, as well as one from its counsel. *See D.I. 111, 128.* In support of its legal position, Congoleum relies primarily upon Fed.R.Civ.P. 45(c)(3) and *American Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734 (Fed.Cir.1987) and *Micro Motion, Inc. v. Kane Steel Co., Inc.* 894 F.2d 1318 (Fed.Cir.1990).

**Mannington's Arguments:**

Mannington opposes the quashing of its subpoena because:

1. The court may issue a protective order that will prevent disclosure of Congoleum's trade secrets or confidential information from competitors.

2. Mannington is seeking highly relevant and probative information relating to "secondary considerations" or nonobviousness of the '008 patent and its needs outweigh any burden imposed upon Congoleum.

3. The subpoena seeks relevant documents relating to discussions, agreements, arrangement or understandings between Congoleum and other parties regarding this litigation.

4. Mannington is not seeking any information subject to privilege and if so, such information can be identified in a privilege log.

Similarly, Mannington relies on affidavits—Dr. Chen, Thomas Davis (President and CEO of Mannington) and its counsel—as well as, Fed.R.Civ.P. 45(c)(3) and *Truswal Systems Corp. v. Hydro–Air Engineering, Inc.,* 813 F.2d 1207 (Fed.Cir.1987).

**Discussion:**

*Applicable Standards:*

The Federal Circuit has addressed the issue of a party obtaining sales and financial information, test data and other confidential materials from a nonparty to an infringement action. Interestingly, two of the three cases emphasized by the parties to this motion were decided within six months of one another and which, at first blush, seemingly came to opposite results. *See, Truswal Systems Corp. v. Hydro–Air Engineering, Inc.,* 813 F.2d 1207 (Fed.Cir.1987) *and American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734 (Fed.Cir.1987).[7]

Both cases involved the balancing of "the relevance of the discovery sought, the requesting party's need and the potential hardship to the party subject to the subpoena." *Truswal* at 1210 (quoting *Heat & Control, Inc. v. Hester Industries, Inc.,* 785 F.2d at 1024 (Fed.Cir.1986)). In other words, the court applied a balancing test to determine whether the need of the party seeking disclosure outweighs the adverse affect disclosure would have on the policies underlying the claimed privilege. If the information sought is confidential and its disclosure might be harmful, then "the burden shifts to the party seeking discovery to establish that disclosure of trade secrets and confidential information is relevant and necessary to its case." *American Standard,* 828 F.2d at 741. According to the *American Standard* court, remand occurred in *Truswal* because the court below granted the motion to quash solely on the ground that discovery was sought from a nonparty, without the appropriate aforementioned inquiry. Further, based on affidavits and documents submitted, which were absent in *Truswal,* the district court in *American Standard* issued a protective order.[8] In a later decision, *Micro Mo-*

---

7. In fact, Judge Newman similarly noted in her concurring opinion, commenting that she had hoped that the majority "might seize the opportunity to shed light on the boundary between these decisions," in light of the "scant guidance" provided. *American Standard,* 828 F.2d at 747.

8. In a strong dissenting opinion in *Truswal,* Judge Rich felt that the majority was being "unrealistic, impractical and its holding likely to encourage abuse of the discovery process," and was requiring a certain amount of "mumbo jum-

bo in the [district court's] order, on top of the 15 pages of reported hearing," to demonstrate that the appropriate balancing, consideration, application and determination of the facts to the law had occurred.

Judge Rich and Judge Newman had similar concerns with the majority, which consisted of the same two judges in both *Truswal* and *American Standard* (Chief Judge Markey and Judge Smith). Moreover, Chief Judge Markey was also part of the majority in *Micro Motion.* He did not, however, author the opinion in *Micro Mo-*

*tion Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318 (Fed.Cir.1990), the Federal Circuit again addressed the issue of obtaining discovery from a nonparty competitor in connection with a patent infringement suit. As in *Truswal and American Standard*, the information sought is, in large part, disclosure of the nonparty's confidential materials. Similarly, the nonparty in *Micro Motion*, moved to quash the subpoenas. The court in that case, however, initially focused on the issue of relevance in its analysis, noting that the purpose of a protective order "is to prevent harm by limiting the disclosure of *relevant* and *necessary* information." *Micro Motion*, 894 F.2d at 1325 (emphasis in the original).

Between now and the time when *Truswal* and *American Standard* were decided, both Fed.R.Civ.Prod. 26 and 45 underwent major overhauls in 1993 and 1991 respectively.[9] New Rule 45(c) was enacted which provides for the rights of witnesses. According to the Advisory Committee Notes, it was not "intended to diminish rights conferred by rules 26–37 or other authority." Moreover, the Advisory Committee Notes recognize the intimate relationship between Rules 26 and 45. They note that Rule 45(c)(1) "gives specific application to the principle stated in Rule 26(g)." The Notes recognize that 45(c)(3), which authorizes the quashing of a subpoena, tracks the provisions of Rule 26(c), which empowers the issuance of a protective order, and likewise, protects a nonparty from undue burden by identifying circumstances where a subpoena is not allowed absent a showing of substantial need. Rule 45(c)(3)(A) identifies the circumstances where a subpoena must be quashed or modified: Rule 45(c)(3)(B) is directed to situations where a subpoena should be quashed. *See, Advisory Committee Notes.* Specifically, 45(c)(3)(A)(iii) protects from disclosure privileged or other protected matters, while Rule 45(c)(3)(B)(i) safeguards trade secrets or other confidential research, development, or commercial information. *See, Rule 26(c)(7).*

■ Thus, it appears that all cases cited by the parties are still applicable law. Although the burdens may differ depending upon which rule is invoked, the substantive bases for denying a party discovery are similar. *See, Rule 26(b), (c) and (g); Micro Motion Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1323 (Fed.Cir.1990), *citing Truswal Systems Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d at 1210–11 *and American Standard Inc. v. Pfizer Inc.*, 828 F.2d at 739–42. As a result, a nonparty may seek from the court protection from discovery via the overlapping and interrelated provisions of both Rules 26 and 45. A nonparty moving to quash a subpoena, in essence, is the same as moving for a protective order that such discovery not be allowed.

■ Therefore, this court is required to apply the balancing standards—relevance, need, confidentiality and harm. And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit. *Micro Motion*, 894 F.2d at 1323.

*Analysis:*

■ For the purpose of this motion only, there is no dispute that the information requested constitutes trade secrets and is confidential. *D.I. 123 at 5–6.*

As to the issue of potential harm, Congoleum, through the declaration of Merrill Smith, its Senior Vice–President of Technology, represents these facts:

"3. Congoleum's primary domestic competitors in the resilient sheet vinyl flooring market are Mannington Mills, Inc. ("Mannington") and Armstrong World Industries, Inc. ("Armstrong"), the real parties in interest in the underlying lawsuit.

\*  \*  \*  \*  \*  \*

5. Document Request Nos 6–9, 11–22 and 24 all ask, in whole or in part for Congole-

---

*tion* as he had done in *Truswal* and *American Standard.*

**9.** For that matter, *Micro Motion Inc.* was also decided before the changes to Rules 26 and 45.

Other minor changes occurred to Rule 26 in 2000 which do not appear applicable to this motion.

um trade secrets including highly confidential financial and sales information, marketing plans, marketing reports, advertising information and expenditures, as well as other types of internal memoranda and reports. Such information is kept confidential at Congoleum and Congoleum has taken great measures to ensure that all officers, employees and agents of Congoleum maintain confidentiality of this type of information. For example, Congoleum makes it a practice to have all persons who have access to such information sign employment agreements and/or confidentiality agreements to maintain the confidentiality of Congoleum's trade secrets and confidential information. In addition, access to all of Congoleum's corporate and manufacturing facilities is controlled, uniform security officers are employed and the company uses password protection on its computer systems to protect its electronically stored information.

6. Due to the highly competitive nature of the floor covering industry, it is imperative that Congoleum's competitors not have access to our trade secrets and confidential financial, sales and marketing information. To effectively compete, Congoleum is continually working on product innovations and new product designs and must engage in many types of sales and marketing practices, including competitive pricing. Thus, Congoleum will surely sustain irreparable economic harm if the trade secret and confidential information which is sought is disclosed to Congoleum's competitors, Mannington and Armstrong."

*D.I. 111.*

In response, Mannington argues that Congoleum cannot make a showing of any harm since a court-ordered protective order limits disclosure of confidential information to attorney's eyes only. Mannington relies primarily on paragraph 3 of that order which provides:

*Disclosure of Confidential Information.* Unless otherwise agreed to in writing by the person or entity that produces or discloses Confidential Information or until the court orders otherwise, any party, person or entity receiving Confidential Information shall use it only for purposes of litigating this case and shall not disclose that information to anyone other than counsel of record and the members and employees of their firms.

However, the preceding paragraph states: *Stipulation Providing for the Disclosure and Use of Confidential Information.* The parties may file a stipulation setting out their agreement on the handling and use of Confidential Information, and may include in the stipulation, terms and conditions by which they propose to handle and use Confidential Information received in discovery from a person or entity that is not a party to this action. The parties may include in that stipulation a form for an agreement by which a person receiving information consents to be subject to the jurisdiction of this court for the purposes of enforcing this order.

Moreover, paragraph 6 of the protective order further provides that "[c]ounsel should address in the pretrial order how they propose to handle the use and disclosure of Confidential Information at trial." *D.I. 125 at ¶ 6.* Under the present protective order, confidential information includes nonpublic confidential, proprietary, commercially sensitive or trade secret information. *Id.* The order, by its terms, does not solely address the confidential information of the parties to this litigation, but encompasses any such information deemed to be confidential by "any person or entity producing or disclosing information in response to discovery." *D.I. 125 at ¶ 1.*

What happens with any information disclosed by Congoleum in response to Mannington's subpoena, particularly at trial, is anyone's guess. Although the protective order allows the designation by Congoleum that such information is confidential and limits its initial disclosure to outside counsel, the parties to this litigation are left with the option of how disclosure of such confidential information is handled at trial. As a result, control is in the hands of Congoleum's undisputed competitors and the court. Despite Mannington's arguments to the contrary, "it would be divorced from reality to believe that either party here would serve as the champi-

on of its competitor ... to maintain the confidentiality designation or to limit public disclosure ... during trial." *Micro Motion,* 894 F.2d at 1325. Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a noncompetitor. *American Standard,* 828 F.2d at 741, *relying on Coca–Cola Bottling Co. v. Coca–Cola Co.,* 107 F.R.D. 288, 293, 299 (D.Del.1985). Therefore, potential harm exists for Congoleum resulting from disclosure of the information demanded by Mannington.[10]

Further, "[a] protective order which limits to whom information may be disclosed does not eliminate the requirement of relevance and need...." *Id.* In this regard, Mannington asserts that requests numbers 6–24 in its subpoena are highly relevant to the "secondary" considerations of nonobviousness and potentially critical to rebut Armstrong's

charges of invalidity.[11] To further support its argument regarding relevance, Mannington relies on the declaration of Mr. Chen who visually, including microscopically, examined the flooring samples Congoleum had provided and concluded that these three samples of Congoleum's dual embossed products potentially infringe the '008 patent.[12] Mannington emphasizes that it is not interested in charging Congoleum with infringement or being subject to another suit for declaratory judgment. *D.I. 123 at 9.*[13] However, in light of the declaration of Mr. Chen, Mannington argues that it has shown all that it needs to pursuant to both *American Standard* and *Truswal*—that is, there is some relationship between the claimed invention and information sought.[14]

Reviewing Mr. Chen's declaration, in summary, all he says is that, as a result of his visual/microscopic inspection, he concludes

10. Moreover, the law firms representing the parties in this action also serve as counsel for their respective clients in the prosecution of patent applications and other proceedings before the Patent and Trademark Office, thus, elevating the concern of harm from such disclosure. *See, D.I. 70.*

11. Mannington concedes that some of its document requests include the '903 patent which is not at issue in this matter, but is raised in the second Armstrong case. The subpoena at issue was only filed in the matter at bar. However, Mannington is only willing to limit Request # 6 to the '008 patent claiming that any communications, arrangements and the like that Congoleum made regarding the '903 patent are relevant to the '008 patent.

12. Congoleum emphasizes that Mannington's document requests are not solely directed to the samples provided, but include all dual embossed floor coverings, as well as, resilient sheet vinyl floor coverings, which would involve hundreds of styles, patterns and colors and require searching several different facilities in different states and numerous locations within each facility to properly respond to the requests for the time period involved (from 1995 to the present). Congoleum asserts that a proper response would entail "more than a month and over a few hundred man hours to search for, collect and produce all the documents that Mannington seeks" and would necessitate contacting dozens of people in its accounting, marketing, sales, advertising and R & D departments. *D.I. 111 at ¶ 7.*

13. According to the affidavit of Mr. Davis, Mannington's President and CEO, Congoleum is accurate in that Mannington has neither accused

Congoleum of infringing the '008 or '903 patents nor sued it for alleged infringement of either patent. In fact, Mannington clearly made a conscious decision to avoid such accusations against Congoleum since it presently is engaged in several other lawsuits involving both patents. However, that does not mean that Mannington does not believe that Congoleum's products read on the '008 claims. *D.I. 126 at ¶ 10.*

14. Although suggesting that such examination was sufficient to determine that three of Congoleum's products read on the patent claims and thus, potentially infringe, Mannington has argued the contrary in other telephonic conferences with Court concerning discovery disputes between the parties. *See, D.I. 83 at 26, 29; D.I. 70 at 14, 28–30, 33–34.* During these conferences in its attempt to obtain process/manufacturing information from Armstrong regarding its products and to have a tour of Armstrong's manufacturing facilities, Mannington has argued that a myriad of factors (e.g., temperature, amount of inhibitors, pressure of embossing rolls, cooling stages and other parameters) are involved in determining whether the product infringes the '008 patent. Mannington has represented during the aforementioned conferences that visual inspection and review is inadequate and that the only way infringement by Armstrong's products can be determined is through information that *illustrates or demonstrates how the product is manufactured* since the process is highly relevant to the outcome of the product. *D.I. 83 at 29.* The court has denied access to such information from Armstrong. *D.I. 67 at 13.*

that the three Congoleum samples read on the '008 patent claims and that the Futura product does not meet all the claims of the '008 patent and therefore, it is not prior art. His affidavit does not address any other Congoleum products within resilient sheet vinyl flooring or the dual embossed floor covering. Nothing in Mr. Chen's declaration or in any of the other submissions by Mannington focus on the issue of commercial success/nonobviousness—that is, whether Congoleum's products have been or are successful due to the merits of the claimed invention. *American Standard,* 828 F.2d at 742. In other words, Mannington has failed to carry its burden in showing some relationship between the invention claimed in the '008 patent and Congoleum's confidential financial, marketing and sales data.[15]

Regarding the issue of need, Mannington argues that only through information from Congoleum can it develop the commercial success of Congoleum's products believed to be covered by the claims of the '008 patent, which would be relevant to rebut Armstrong's charges of invalidity. Mannington further asserts that the "uniqueness" of the information requested is obvious because it is confidential and therefore, only in the possession of Congoleum. Ignoring for the moment Mannington's somewhat circular argument, Mannington is required to establish that the discovery of confidential sales information is "reasonably necessary for a fair opportunity to develop and prepare its case for trial."[16] *American Standard,* 828 F.2d at 743. Presently, Mannington is involved in three actions in this jurisdiction alone involving two of its three primary competitors. In all of these actions, invalidity and obviousness are at issue. Although the financial, marketing and sales data of Congoleum is "unique" in the sense that it is information about Congoleum, financial, marketing and sales information is not uniquely available from Congoleum, the party from whom the information is sought. Mannington presum-

ably has access or will have access to similar information from its opponents during discovery on their defenses. *See, D.I. 191 at 14–15.*

Addressing now the breadth of the subpoena, despite Mannington's arguments to the contrary, these document requests are substantial, essentially asking for every financial, marketing, testing, and sales document from Congoleum for all resilient sheet vinyl floor covering products and all dual embossed floor coverings from 1995 to the present, a seven year period. *D.I. 111 Bannon Declaration Ex. 1.* Although Mannington ignores Congoleum's representations regarding the time, effort, employee involvement and resulting cost to respond by arguing that the information sought is likely on computers and thus, readily available, the undisputed evidence shows otherwise. *See, footnote 12.* Therefore, the potential hardship to Congoleum in responding to the subpoena clearly outweighs any tangential need by Mannington for this information.

"Where proof of either relevance *or* need is not established, discovery is properly denied." *American Standard,* 828 F.2d at 743. (emphasis in original). Therefore, consistent with the findings herein,

IT IS ORDERED that Congoleum's motion to quash is GRANTED.

---

**15.** The Smith declaration suggests factors other than the claimed invention, noting that to "effectively compete, Congoleum is continually working on product innovations and new product designs and must engage in many types of sales and marketing practices, including competitive pricing." *D.I. 111 Smith Declaration at ¶ 7.*

**16.** Moreover, evidence of sales of different infringing products substantiating commercial success of the claimed invention cannot be cumulative. *American Standard,* 828 F.2d at 742–743.