591 A.2d 578
**OPTIC GRAPHICS, INC.**
v.
**Ross AGEE, et al.**
**No. 1356, Sept. Term, 1990.**
Court of Special Appeals of Maryland.
June 27, 1991.

John A. Scaldara (Stephen P. Kauffman and Wendy A. Kronmiller, on the brief), Baltimore, for appellant.

Stanley B. Rohd and Kathleen McDermott (Weinberg and Green, on the brief), Baltimore, for appellees.

Argued before ALPERT, BLOOM and ROSALYN B. BELL, JJ.

ALPERT, Judge.

In this case we are asked to decide (1) whether internal operating information (internal business facts) consisting of marketing strategy and pricing information are trade secrets under Maryland's Uniform Trade Secrets Act (the Act), and (2) under what circumstances a trial court appropriately may impose sanctions under section 11–1204 of the Act and Maryland Rule 1–341 for bad faith in conducting litigation.

## FACTS AND PROCEEDINGS

Optic Graphics, Inc. (appellant) is a Maryland corporation located in Glen Burnie, Maryland, which engages in the graphic arts business. Optic primarily operated as a printing company from its inception in the early 1900's until about 1980, when it began to manufacture vinyl looseleaf binders.

The company is a family business that currently is run by the founder's grandson, David Kinlein. Kinlein, a thirty-six-year-old business graduate, is the company's president and chief executive officer. His mother, Carolyn Wilder, is the personnel director. The company employs about 375

people. In 1989, its gross revenues approached 27 million dollars.

In July 1987, Optic hired Ross Agee (appellee) to work as an estimator for its printing department. Optic had solicited Agee in April 1987 while he still was employed by Sheridan Press. Sheridan terminated Agee in June 1987, after a reorganization. Seeking employment, Agee contacted a number of printing companies. Three, including Optic, extended him offers of employment. Of these, Optic was the only company that manufactured vinyl looseleaf binders.

On or about July 27, 1987, Agee began work with Optic as an estimator in its printing department. When the company reorganized its corporate structure in January 1988, it gave Agee responsibility for all of Optic's estimating functions, *i.e.*, both the printing and looseleaf binder divisions. Agee estimated the cost of materials and labor required to complete those jobs on which Optic planned to submit a bid. The method by which he did so "consisted of matching job specifications to a plan to produce a product in terms of production standards[1] and budgeted hourly rates."[2] To perform this function, Optic necessarily had to give Agee access to certain information that the company considered to be confidential: pricing, material cost, markups, profit margins, machine cost rates, production rates, and marketing strategies.

Agee had a long-time friend, Michael Zanella (appellee), whom he had met when they both were employees at Port City Press, another graphic arts company engaged primarily in printing. The two had discussed starting their own printing business on and off for a number of years. In 1980, Bindagraphics Corporation—one of Optic's competi-

---

1. A production standard is a company's range of operating speeds for different equipment in units of output. Record at 70.

2. A budgeted hourly rate is the theoretical cost for a company to run its equipment on an hourly basis. Record at 69.

tors—hired Zanella to work in its vinyl looseleaf manufacturing business where he remained until his resignation in December 1989. When Sheridan terminated Agee in June 1987, he and Zanella resumed their informal discussions about starting a business. They contacted a business broker that year and asked the broker to be on the lookout for a small printing company.

Early in 1988, Agee and Zanella learned that Specialties Binder, a looseleaf bindery business, was for sale. They held a number of informal discussions with the owner, a Mr. Ridgeway, but failed to reach an agreement for the purchase of the business. In December 1988, Ridgeway informed them that he had sold the business to a Canadian printing company. The pair lost their momentum until they again contacted Ridgeway in the spring of 1989. Ridgeway indicated that although he had completed the sale, he had retained the vinyl division and its equipment, and wanted to resume negotiations.

In June 1989, Agee and Zanella agreed to purchase the vinyl looseleaf binder manufacturing business. The pair then formed "A to Z Enterprises, Inc." [3] (appellee), a Maryland corporation, to conduct the business. The corporation apparently had neither assets nor customers at that time.

From June through August 1989, Agee and Zanella researched and prepared a formal business plan to secure financing for the business. Agee and Zanella continued to work for their respective employers through December 1989, working on their new business venture at night and on the weekends.

---

**3.** Agee and Zanella later changed their company's name to "A to Z Looseleaf, Inc." They used "Enterprises" in the original name because they believed that their respective employers would fire them if the employers learned of their business plans. Agee's employer, David Kinlein, testified that not only would he have fired Agee had he learned of Agee's plans, but also that he never would have hired Agee to begin with had he known that Agee had notions of running his own business.

Early in 1989, Optic developed a formal marketing plan for its future growth; Agee received a copy of the plan, and had this information available when he and Zanella prepared their financing proposal that summer. In its complaint, Optic alleged, *inter alia*, that Agee and Zanella had incorporated a portion of its marketing strategy into A to Z's financing proposal.[4] It further alleged that the two then disclosed this marketing strategy, as well as other confidential information, to various third parties without Optic's knowledge or consent.[5]

In October 1989, Agee and Zanella tentatively secured financing through a Small Business Administration (SBA) loan; settlement was scheduled for early February 1990. Agee tendered his resignation to Optic's treasurer, John Strauss, on December 26, 1989, informing Strauss that he was going into his own business with Zanella. At that time, A to Z Looseleaf, Inc. was not yet operational. The company had no assets, contracts, customers, or prospective customers. Neither Agee nor Zanella had contacted any vendors.

On January 24, 1990, Optic filed suit against Agee, Zanella, and A to Z Looseleaf, Inc., asking for damages and *ex*

---

**4.** Specifically, Optic complained in its brief that the financing proposal stated that Optic " 'neglects certain segments of [A to Z's] defined market.' " While Optic will " 'perform miracles for its major customers [naming specific Optic customers] upon whose large volume and moderate profit levels Optic will base its future growth, other segments of the market, most noticeably those targeted by A to Z Looseleaf, Inc. in the Baltimore–Washington area, have been neglected in many ways.' "

Optic also complained that Agee and Zanella "boasted" in the financial proposals that they currently held influential positions at A to Z's competitors, Optic and Bindagraphics. That information was included in the proposal's "resume" section, which told prospective lenders the background of A to Z's chief operating officers.

**5.** The parties to whom Agee and Zanella purportedly disclosed this information are as follows: A to Z's attorneys and accountant, the employees of prospective lenders, including the Baltimore Economic Development Company (BEDCO), Provident Bank, Maryland National Bank, and the Small Business Administration (SBA).

*parte* injunctive relief.[6] In its complaint, Optic alleged that Agee and Zanella had misappropriated Optic's trade secrets, that Optic as a result had sustained damages, the nature and extent of which were not yet known, and that Agee had breached his confidentiality agreement with Optic when he used and disclosed Optic's trade secrets. Optic attached and incorporated into its complaint a faxed copy of the "Confidentiality Agreement" that Agee allegedly executed in July 1987.[7] The suit effectively impeded Agee's and Zanella's plans to move forward with their business.[8]

Agee and Zanella waived the hearing, scheduled for February 2, 1990, on Optic's request for an *ex parte* injunction. The parties held four meetings in late January and early February to discuss settlement. These negotiations ultimately failed. At the final meeting, Agee returned to Optic a number of confidential documents that included pricing information for one of Optic's largest customers, raw material costs, and information about the machines that it used in its manufacturing process.[9]

---

**6.** Apparently, Optic's treasurer, John Strauss, indicated to Agee and Zanella that Optic initiated the suit solely in response to a rumor that a former Optic competitor—Jerry Nocar—was financing A to Z in violation of a noncompetition agreement that Nocar had with Optic. Optic did not name Nocar as a defendant or mention the rumor in its complaint.

**7.** When Optic hired Agee, he executed several employment-related documents that Optic maintained in his personnel file in the regular course of business. The confidentiality agreement purportedly was one of them.

**8.** Agee and Zanella had to disclose the suit to their potential lenders, which essentially foreclosed the possibility of any financing. The SBA indefinitely postponed settlement on the loan pending the suit's resolution. Agee and Zanella were unable to purchase equipment, execute a lease, or occupy A to Z's intended business premises. The two used personal funds to lease space at their seller's facility and, at the time of trial, had begun to manufacture their product.

**9.** Optic contends that Agee did not have permission to retain this material and that the information returned directly related to the market which A to Z targeted in its financing proposal, *i.e.*, that

On February 13, 1990, Agee and Zanella filed a motion to dismiss the complaint. The circuit court scheduled the matter for trial on March 16, 1990. At his deposition on March 6, 1990, Agee for the first time questioned whether the signature on the photocopied confidentiality agreement in the personnel file that Optic produced was his. Agee had requested the opportunity to view the original document about one month prior to his deposition. Optic's personnel director, Carolyn Wilder, allegedly sent the original to 20 South Charles Street, Agee's counsel's former address. No one ever found the letter. On March 8, 1990, Agee and Zanella retained a handwriting expert, Gary Girton of the Maryland State Crime Laboratory, to examine the documents, *i.e.*, the photocopy and the faxed copy. He concluded that the signature on the documents was an imitation forgery.[10]

On March 9, 1990, Agee and Zanella withdrew their motion to dismiss and answered Optic's complaint. On March 13, 1990, by faxed letter dated March 12, 1990, Agee's counsel advised Optic's counsel that Girton would testify that the signature was an "imitation forgery," and provided opposing counsel with the expert's written report and conclusions. On March 14, 1990, Agee amended his answer to include a negative defense, in which he denied that he had signed the "Confidentiality Agreement."

Optic's counsel attempted to settle the case on March 14, 1990. Optic's terms included a dismissal with prejudice and a mutual release. Agee and Zanella agreed to execute the

---

segment of the market in which Optic hoped for business but would allocate only a few of its sales resources.

Agee, on the other hand, contends that he had these materials to develop estimates when he worked at home on evenings and weekends. Optic's treasurer, John Strauss, admitted that he knew that Agee worked at home and would have needed these materials. In fact, Agee testified that at the time he resigned, Strauss had asked him to continue his estimating work for a short time.

10. An "imitation forgery" is a forged signature that someone has imitated from a model signature. Record at 173.

releases if Optic paid them $150,000. Optic declined to do so. On the day of trial, Agee and Zanella reduced their demand to a dismissal with prejudice, but reserved the right to request sanctions. Optic rejected the offer and proceeded to a trial on the merits. After a two and one-half day trial, the trial court rejected Optic's claims for injunctive relief and damages and found in favor of Agee, Zanella, and A to Z Looseleaf, Inc.

On March 26, 1990, the trial court entered final judgment, which reserved the right of Agee and Zanella to request attorneys' fees and costs. On March 30, 1990, the pair applied for attorneys' fees and costs pursuant to Maryland Rule 1–341 and section 11–1204 of Maryland's Uniform Trade Secrets Act, asserting that Optic had pursued the suit in bad faith. Optic moved the court to alter or amend its ruling that there was no misappropriation of trade secrets.

The circuit court held a hearing on Optic's motion to alter or amend the judgment and on the motion of Agee and Zanella for sanctions. The court denied Optic's motion to alter or amend.

After hearing argument on the motion for sanctions, the trial court assessed attorney's fees and expenses for Optic's continuance of its action after March 13, 1990—the date that Optic's president learned by faxed letter dated March 12, 1990 that someone had forged Agee's signature on the confidentiality agreement. It is not clear, however, whether the court also found that Optic had *initiated* the action in bad faith. *See* discussion *infra* in part II of this opinion.

The court ordered Optic to pay Agee's and Zanella's attorneys' fees and costs of $25,000. Both sides had stipulated to this figure as representing all of their legal fees and expenses from March 14, 1990 through April 30, 1990. The court entered final judgment on May 21, 1990.

Optic filed an appeal from that judgment. At the same time, Agee and Zanella filed a cross-appeal from the trial

court's refusal to award sanctions from January 24, 1990, the date the action commenced.

On appeal, Optic asks us whether:

I. The trial court erred when it found that Optic had failed to establish the existence and misappropriation of trade secrets.

II. The trial court erred when it imposed sanctions against Optic.

On cross-appeal, Agee and Zanella ask us whether:

III. The trial court erred when it refused to award sanctions from the date that Optic commenced its action.

## I.

Optic contends that appellees misappropriated its trade secrets. Specifically, Optic asserts that the information which Agee retained—pricing information, raw material costs, and marketing strategy—constitutes trade secrets protected by the State's Uniform Trade Secrets Act. Optic also contends that Agee misappropriated this information when he wrongfully retained it and subsequently disclosed it to Zanella and to potential lenders without Optic's knowledge or consent.

We begin by noting the conspicuous absence of an enforceable covenant to restrict competition. Recently we observed that the Court of Appeals held

absent an enforceable covenant restricting competition, an employee may make arrangements to compete with his former employer before termination of his services, but he may not solicit customers or directly compete while still employed. The right to prepare to compete is limited only where the employee 'has committed some fraudulent, unfair or wrongful act' in the course of his preparation. Moreover, an employee is not required 'in all cases [to] tell his employer of his future plans to become a competitor.' Once the employment relationship is terminated, the employee may solicit his former employer's

business absent an enforceable covenant restricting competition, misuse of trade secrets, or misuse of confidential information.

*Dworkin v. Blumenthal,* 77 Md.App. 774, 779, 551 A.2d 947 (1989) (citations omitted).

█ Courts for the most part have adopted one of two views as to what constitutes a trade secret.[11] *See* Annotation, *What Is "Trade Secret" So As To Render Actionable Under State Law Its Use or Disclosure By Former Employee,* 59 A.L.R. 4th 641, 652 (1988). One view is found in the Restatement of Torts, *see Restatement of Torts* § 757 (1939); the other is found in the Uniform Trade Secrets Act, *see* Unif. Trade Secrets Act, 14 U.L.A. 433 (1985). The Court of Appeals adopted the *Restatement* definition of "trade secret" in *Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.,* 238 Md. 93, 110, 208 A.2d 74, *cert. denied,* 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965).

Under the *Restatement* view,

'[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating, or preserving materials, a pattern for a machine or other device, or a list of customers.'

*Id.,* at 105, 208 A.2d 74 (quoting Restatement of Torts § 757 comment b (1939)); *see also Note, Maryland Uniform*

---

**11.** Both views are attempts to provide a uniform guideline for determining protectable trade secret status and they contain similar provisions; for instance, under both views, the secrets must be information, must be valuable, must be generally unknown, and must be the subject of reasonable security measures designed to maintain confidentiality.
Annotation, *What Is "Trade Secret" So As To Render Actionable Under State Law Its Use Or Disclosure By Former Employee,* 59 A.L.R.4th 641, 652 (1988).

*Trade Secrets Act,* 49 Md.L.Rev. 1056, 1060 (1990) [hereinafter Note].

The court also adopted the *Restatement's* list of factors to be used in determining whether particular information qualifies as a trade secret:

'(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'

*Id.* at 110, 208 A.2d 74 (quoting *Restatement of Torts* § 757 comment b (1939)); *see also* Note, *supra,* at 1060–61.

On July 1, 1989, Maryland adopted the Uniform Trade Secrets Act (the Act).[12] *See* Act of July 1, 1989, ch. 598, 1989 Md. Laws 3642; *see also* Md.Com.Law Code Ann. § 11–1201 to –1209 (1990). To the extent that the *Restatement* presents a narrower view, the Act pre-empts that definition. *See* Note, *supra,* at 1061 n. 36 & 1061–66.

■ Maryland's Uniform Trade Secrets Act defines "trade secret" as follows:

'Trade Secret' means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons

---

12. The purpose of the Act is "to codify and clarify the existing common law of trade secrets, and to minimize substantive differences among the adopting states by expressly requiring uniform construction." Note, *Maryland Uniform Trade Secrets Act,* 49 Md.L.Rev. 1056 (1990) [hereinafter Note]; *see also* Unif. Trade Secrets Act, 14 U.L.A. 434 commissioners' prefatory note (1990).

who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Com. Law Code Ann. § 11–1201(e)(1) & (2) (1990). This definition clearly "is based on the *Restatement* comment...." [13] Note, *supra,* at 1061. Although all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes "trade secrets" within the definition of the statute. *See Minuteman, Inc. v. Alexander,* 147 Wis.2d 842, 434 N.W.2d 773, 777 (1989).

There are two types of trade secrets: technological developments and internal operating information. *See* 2 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 14.06, at 35 (4th ed. 1982 & Supp.1991). Technological developments are "independent of any connection with a particular company." *Id.* Internal operating information (internal business facts) "relat[es] to a particular business organization." *Id.* At issue in this case are internal business facts peculiar to Optic and whether these are "trade secrets" within the meaning of the Act.

In determining whether the information constituted "trade secrets," the trial court relied on the Restatement factors enumerated *supra.* As to the pricing information, the court made the following findings:

The extent to which the information is known outside of the business; some of that might be known, some of it might not be.

---

**13.** There is "at least one substantive difference [between the two] that significantly broadens the scope of trade secrets law [under the Act]." Note, *supra* note 11, at 1061.

The common law required that the purported trade secret be 'used in [one's] business,' and provide 'an advantage over competitors who do not know or use it.' Under the Act, this business requirement is absent and it is unnecessary to show that one gains value from the competitors' lack of knowledge.

*Id.* (quoting *Restatement of Torts* § 757 comment b (1939)).

The extent to which it is known by employees; some employees know, some don't.

The extent to which measures are taken to guard the secrecy; the plaintiffs certainly have fallen very short of that in many ways, because they didn't get these things [the Confidentiality Agreement] signed by the key employees that they should have, and the ones that they had, at least the most important one in this case[,] was lost.[ ]

The value of the information to him or his competitors. That is always subject—that cannot be an objective test. It is sort of always a subjective test.

Amount of effort or money expended in developing the information; that comes through the years. That probably costs a lot of money, and the test has been met by the plaintiffs, but that will continue to cost money, because things do change.

[ ] The ease or difficulty with which the information could be promptly acquired or duplicated by others. I don't think it could ever be duplicated by others in this particular shop.

The question, I think, is whether or not this information is of such importance it is meaningful to the defendants, and I cannot say that it indeed is meaningful to the defendants, because it is, number one, subject to change; number two, subject to the market; number three, subject to machinery, cost of living increases and employees running machinery. There are so many variables, it is hard to say whether this will be in place one day, one year, or one century.

The court believes that the pricing information is not a trade secret.

With respect to the marketing strategy, the court said

I can see where the plaintiffs might believe that that is a trade secret, but it is nothing more than a strategy, which if one goes into the marketplace, you could find that salespeople call on you or not by simply going to people who are purchasers and saying did Optics call you,

did A to Z call you, or did anybody call you. So the information is available, and it's always subject to change[.] Also, because with the profitability that Optics has encountered, some twenty-three million back in 1988, maybe twenty-seven million in '89, their objectives are different, and obviously from what the evidence has produced, the objectives of the defendants in this case, A to Z, are different.

Whether or not that information is used or could be used is certainly not before this court. All I can tell you is that Mr. Agee has said I will not use that information, and how one determines whether or not he uses it as an impossible question that this court nor any other court can answer. Nor maybe a psychiatrist or psychologist could answer, because one would have to look into the mind of Mr. Agee and figure the intent out from a pricing number that he gives to his future purchasers.

.... The marketing numbers are variable also, and I don't think that they could be ascertained to be a trade secret. I find from the evidence that there are no trade secrets.

The court concluded by making additional comments about the evidence.

Number One, there is no use of this information. Even if it were found to have been a trade secret, there is no use to the detriment of the plaintiff at this time shown by the evidence.

There is no evidence that there is a violation of a contract which was allegedly signed by Mr. Agee, but which the court has to find was not signed by Mr. Agee. There is no original and no evidence that it was ever signed by Mr. Agee. In fact, it is emphatically denied. So there is no signature on that other than someone who, apparently at Optics, whoever that might be, signed that.

There is no evidence of use or misuse. There is no evidence of damages to the plaintiffs at this time.

The court has found that even if these items are trade secrets, they're peculiar to the plaintiff, and that is who can use these to the best advantage.

Maryland Rule 8–131(c) delineates the scope of our review in this case. *See Operations Research, Inc. v. Davidson & Talbird, Inc.*, 241 Md. 550, 556, 217 A.2d 375 (1966); *Space Aero Products Company, Inc. v. R.E. Darling Co., Inc.*, 238 Md. 93, 106, 208 A.2d 74 (1965). The rule provides that

[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Md.R. 8–131(c).

▮▮▮▮ Pricing information and marketing strategy are protectable as "trade secrets." *See, e.g., S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1260 (3d Cir.1985) (pricing information); *Air Products & Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114, 1122 (1982) (marketing strategy). As noted *supra,* there are two requirements for a court to find that information is a "trade secret" under the Act: the information must (1) hold "independent economic value" because it is not "generally known" to or readily ascertainable by others who stand to benefit economically if they use or disclose it, and (2) be the subject of reasonable efforts to maintain its secrecy.

▮▮▮ In this case, the trial court concluded from the testimony presented at trial that the pricing information was *not* a trade secret because it would not be "meaningful" to appellees. The court determined that the pricing information would not be "meaningful" because it was (1) subject to change, (2) subject to market forces, (3) subject to the type of machinery used, and so forth. In short, the pricing information was composed of so many variables that it was generally subject to change and specific to Optic. Thus, the court was unable to find that appellees could "obtain economic value from its disclosure or use" as re-

quired by the Act. The court further found that Optic's efforts to safeguard and keep secret the information fell short of what the statute required. We cannot say that the trial court's findings of fact in this regard were clearly erroneous.

 The trial court then concluded that the marketing strategy was not a trade secret because it, too, was subject to change and because the court found that the information was readily available from the marketplace. That is, appellees could obtain the same information simply by talking with prospective purchasers. The court further found that the two companies (Optic and A to Z) would have substantially different market objectives because of their difference in size. We note as well that the marketing strategy was of value to appellees only if they could use Optic's pricing information to underbid the company in the "neglected" segment of its market, and we already have determined that they could not because the pricing information was specific to Optic. As before, we cannot say that the court's findings were clearly erroneous. Because the information at issue was not a "trade secret" within the meaning of the Act, it follows that there was no "misappropriation."

## II.

Optic contends that the trial court erred in imposing sanctions against Optic, pursuant to Maryland's Uniform Trade Secret Act and Rule 1–341, for maintaining its action in bad faith or without substantial justification.

Maryland's Uniform Trade Secrets Act provides, *inter alia,* that a

court may award reasonable attorney's fees to the prevailing party if:

(1) A claim of misappropriation is made in bad faith;

(2) A motion to terminate an injunction is made or resisted in bad faith; or

(3) Willful and malicious misappropriation exists.
Md.Com. Law Code Ann. § 11–1204 (1990).

The purpose of this provision is to "discourage conduct that abuses legal and business process." Letter from William T. Fuyer, III, Professor, University of Baltimore School of Law, to Maryland House Judiciary Committee, February 24, 1989.

Maryland Rule 1–341 provides that

[i]n any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in *bad faith* or *without substantial justification* the court may require the offending party or the attorney advising the conduct or both of them to pay the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

(emphasis added).

In *Needle v. White,* 81 Md.App. 463, 473–74, 568 A.2d 856 (1990), we said that "[t]he Supreme Court has characterized 'bad faith' as actions that are maintained 'vexatiously, wantonly or for oppressive reasons.' Although Maryland appellate courts have not, to our knowledge, defined 'bad faith' under rule 1–341, the few cases addressing the issue indicate that only egregious behavior will support such a holding." *Id.* (citations omitted). Although sanctions are improper if "the underlying action presents a colorable claim, ... a trial court has inherent power to impose sanctions for *continuing* an action vexatiously, wantonly, or for oppressive reasons. Such action, however, requires clear evidence that the action is entirely without color and taken for other improper purposes amounting to bad faith." *Id.* (emphasis added). Thus, "[t]he bad-faith exception for the award of attorney's fees is not restricted to cases where the action is filed in bad faith ... [but] may be found ... in the conduct of the litigation." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980).

 The above holds true whether we are addressing a claim of bad faith under Rule 1–341 or under section 11–1204. Likewise, our standard of review is the same for both.

In *Johnson v. Baker*, 84 Md.App. 521, 528–29, 581 A.2d 48 (1990), we said that

[a] court must make an evidentiary finding of 'bad faith' or 'lack of substantial justification' before it imposes Rule 1–341 sanctions. The existence of bad faith or lack of substantial justification is a question of fact subject to a 'clearly erroneous' standard of review. Upon a finding of bad faith or lack of substantial justification, the court must decide whether to award attorney's fees and costs. On appeal, the appellate court reviews the propriety of the sanction imposed under an abuse of discretion standard and will not disturb the sanction unless the lower court abused its discretion.

At the sanctions hearing, the court made the following findings:

I have to make a finding under this case that there is bad faith or lack of substantial justification in order to proceed to the next area. So I so find. Finding that, basically I'm going to adopt the Defendant's memorandums because I think they speak very adequately and on point to the conduct here that is bought by the Court.

I really believe that the document, forged document is very, very important; that there was an attempt, and more importantly, not only was it forged but it was an attempt to copy another signature that was known to be an exemplar of the Defendant. I think there is clear evidence that the action that was taken here is entirely without any color and taken for improper purposes. An action is frivolous if it is taken for the purpose of maliciously injuring a person.

There is no question in this case what this did to the Defendants was put them on hold, number one, stopped the infancy of this corporation in its heels because they

couldn't even get financing without the suit being prohibited.

So the Court finds for all those reasons, plus those that are named more specifically in the Defendant's briefs and memorandum, that there is bad faith and I so find.

The next issue is that of the amount of damages. Mr. Rohd, I'm inclined in this case, because of the nature of the case, to tell you that the bad faith in my mind, if it exists, you may argue that it exists at the beginning of the filing of this suit. That may be your argument.[ ]

I'm going to reject that and find that the bad faith in this case begins when there is a finding by the expert in this case that there was a forged document.

I can't say that Mr. Kinline [sic] knew or should have known that that document was forged until he was given that evidence. Once that was presented to him and he chose not to do anything with it or chose not to go out and have it examined, then his bad faith I think is shown very clearly at that particular time.

So any damages which are alleged to have taken place will go from the date of March 13th and forward. That is the Court's finding.

Although initially it is unclear from the record extract whether the trial court made a finding of bad faith or lack of substantial justification, the court's later comment clarifies its finding: "That's what the intent is now that the Court has found bad faith. That was the first threshold finding."

Because the trial court, in reaching this holding, adopted appellee's memoranda—presumably the trial memorandum and the application for sanctions—it is unclear precisely *when* the court below found the bad faith began. Optic alleged in its complaint that appellees had *actually* misappropriated its trade secrets and that Optic had *actually* suffered damage as a result. Kinlein later testified that he had no actual knowledge that appellees had misappropriated or misused trade secrets, and that he instituted suit " 'to

create a level playing field for future competition.'" From this, appellees alleged, and the court apparently agreed, that Optic had no basis at all for its suit. Optic then purportedly fabricated a theory of industrial espionage to justify the false allegations in its complaint. That is, it abandoned allegations that it had suffered from appellee's actual misappropriation of its trade secrets and presented instead a theory that Agee had "engaged in industrial espionage" and "in unlawful preparatory efforts to compete." From this, it seems as though the court was finding that Optic had *initiated* the suit in bad faith.

On the other hand, the trial court expressly found that "the bad faith in this case begins when there is a finding by the expert in this case that there was a forged document" and that "any damages which are alleged to have taken place will go from the date of March 13th and forward." That is, the court's express finding is that the bad faith commenced when Optic learned of the forged document.[14]

Because of the apparent conflict as to *when* the bad faith actually commenced, we shall vacate the award of attorney's fees and expenses, and remand in order that the trial court may, with greater clarity, determine precisely when the bad faith began. For reasons stated *infra*, however, that determination shall apply only to the breach of contract claim.

### A. *Initiation of the Lawsuit*

Prior to initiating the suit, Kinlein knew that:

1. Agee left Optic to begin a competing vinyl looseleaf binder business.

2. Agee's partner in the business, Zanella, was the former manager of Bindagraphics, a vinyl looseleaf binder business in direct competition with Optic.

---

**14.** On March 13, 1990, by faxed letter dated March 12, 1990, Optic learned that an expert would testify that the signature on the confidentiality agreement was an imitation forgery. Thus, the court assessed attorney's fees and expenses beginning on March 13, 1990.

3. Agee's position as an estimator at Optic required him to have "total knowledge of [Optic's] entire cost system and pricing system."

4. Agee conceivably could use this information to "predict" Optic's prices.

5. Agee and Zanella formed A to Z Enterprises in June 1989, six months before they resigned from their respective companies.

6. Agee continued to attend Optic's business meetings, at which employees discussed confidential information such as pricing, during these six months.

7. Agee did not inform Optic of his plans to open a vinyl binder business until he resigned in December 1989.

8. Optic had a confidentiality policy and required its employees to sign a confidentiality agreement.

We already have noted that pricing information and marketing strategies are protectable trade secrets. Further, both the statute and the case law make clear that a party may initiate an action *before* damages actually accrue. *See* Md.Com. Law Code Ann. § 11–1202(a) ("Actual or *threatened* misappropriation may be enjoined.") (1990) (emphasis added); *see also Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114, 1120–25 (1982). From these facts, we think that Optic had reason to believe that it had a colorable claim when it initiated its suit against appellees.

We have said before that " 'free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a *colorable* claim must be allowed to assert it without fear of suffering a penalty more severe than that typically imposed on defeated parties.' " *Dent v. Simmons,* 61 Md.App. 122, 124, 485 A.2d 270 (1985) (citation omitted). Neither rule 1–341 nor section 11–1204 were intended to penalize a party and/or counsel for asserting a colorable claim or defense. *See Needle v. White,* 81 Md.App. 463, 472, 568 A.2d 856 (1990).

In this case, the trial court placed great weight on Agee's credibility. It was entitled to do so [under Rule 8–131], and to find in appellee's favor as a result, but that was an insufficient basis on which to impose sanctions for bad faith.

In *Bohle v. Thompson,* 78 Md.App. 614, 554 A.2d 818 (1989), we said:

> To prevent placing a chill on a person's right to resort to the judicial system for legal redress, a trial court's finding under Rule 1–341 must transcend a determination of who the prevailing party will be. A person has a right to 'lose' within the judicial system without incurring the added imposition of paying the other side's attorney's fees.

*Id.* at 639, 554 A.2d 818.

We hold that the trial court was clearly erroneous to the extent it found that Optic acted in bad faith by initiating suit on a trade secrets theory. We further hold that the lower court abused its discretion if it imposed sanctions on this basis.

B. *Continuation of the Lawsuit After March 13*

The trial court also based its finding of bad faith on the existence of the forged confidentiality agreement and particularly on Optic's continuance of the action even after it learned of the forgery on March 13. We agree that the deliberate use of a falsified document is a serious misuse of the judicial process. Notwithstanding Optic's circumstantial evidence suggesting the existence of a confidentiality agreement, we hold that the trial court was not clearly erroneous in finding bad faith on this basis.

The breach of contract claim and the misappropriation of trade secrets claim were severable, however. That is, the claims stood separate and apart from each other and the knowledge that the confidentiality agreement was forged, *i.e.,* did not validly exist, did not necessarily destroy the action for misappropriation of trade secrets. Consequently, we believe that Optic still had a colorable claim under a

misappropriation of trade secrets theory even after the parties learned of the forgery.

Although the trial court had the power to impose sanctions for "continuing an action vexatiously, wantonly, or for oppressive reasons," there had to be "clear evidence that the action [was] entirely without color and taken for other improper purposes amounting to bad faith" for it to do so. *Needle*, 81 Md.App. at 474, 568 A.2d 856. On the facts of this case and the inferences deducible therefrom, we do not think that bad faith clearly was established with respect to the trade secrets claim.

 If counsel can separate the fees and expenses generated by the defense of the trade secrets claim from those generated by the defense of the breach of contract claim, then we think that the trial court appropriately may impose sanctions for bad faith with respect to the breach of contract claim.

We reverse the trial court's imposition of attorney's fees and expenses based on the trade secrets claim, but remand for the court to determine when the bad faith began, *i.e.*, whether it began when Optic initiated suit or when Optic continued the action after March 13, 1990—the date it learned of the forged document, assuming that counsel can determine those fees and expenses attributable to the breach of contract claim.

### III.

Because of our determination in part II, we do not address appellee's contention that the court erred when it refused to impose sanctions from the date that Optic commenced its action.

JUDGMENT FOR APPELLEES/CROSS–APPELLANTS ON THE MERITS AFFIRMED; JUDGMENT FOR ATTORNEY'S FEES VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID ¾ BY APPEL-

LANT/CROSS–APPELLEE; ¼ BY APPELLEES/CROSS–APPELLANTS.