732 A.2d 970

**Martin Charles BOND**

v.

**POLYCYCLE, INC.**

**No. 1545, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 7, 1999.

Robert J. Feldman, Towson (Charles Edward Mentzer, Baltimore, on the brief), for Appellant.

Jeffrey L. Forman (Bruce E. Kauffman and Kauffman and Forman, P.A., on the brief), Towson, for Appellee.

Argued before SALMON, KENNEY and ADKINS, JJ.

ADKINS, Judge.

This case is an appeal from an order of the Circuit Court for Baltimore County issued by the Honorable Norris Byrnes against Martin Bond, appellant, in favor of PolyCycle Corporation (PolyCycle), appellee. The trial court found that Bond misappropriated a trade secret and issued an injunction restricting him from disclosing or making use of the technology he developed on behalf of PolyCycle. PolyCycle was also awarded attorneys' fees. Appellant timely noted this appeal.

Appellant asks us to determine whether the trial court erred in: 1) finding that he violated the Maryland Uniform Trade Secrets Act; 2) concluding, without the appropriate finding of fact, that he usurped a corporate opportunity; 3) ordering him to pay appellee's counsel fees; and 4) placing an unreasonable restraint on his right to free speech.

For the reasons that follow, we perceive no error and affirm the judgment of the circuit court.

## FACTS

Prior to July 1995, George Brown and Marvin Marks were involved in discussions concerning a potential investment in Antaeus Group, Inc. (Antaeus). Later, Brown and Marks approached appellant, an engineer, and asked him to review a technology patented by Antaeus, which separated toxins from medical waste. It was Brown and Marks's idea that the same technology could be used to remove paint and other adherents from plastic in a way that would be non-destructive to the plastic. In essence, the process broke the plastic into small pieces and applied a combination of heat and agitation to break the bond between the paint adherent and the plastic, without changing the physical or chemical properties of the plastic. In exchange for Bond's review of the technology,

Brown and Marks offered him a share of a proposed joint venture to license and commercialize the technology.

Appellant reviewed the technology and concluded that it had great economic potential. As a result, Bond, Brown, and Marks formed PolyCycle in 1995 "[t]o engage in the business of designing and manufacturing equipment for use in the separation of adherent foreign matter from solid materials, including the separation of paint from plastic resins and providing the use of such equipment as a service to others...." In exchange for a license to use the Antaeus process and common stock in Antaeus, PolyCycle paid Antaeus $700,000 and agreed to pay it future royalties.

Bond was named the president of PolyCycle and was responsible for the daily operations of the company. Brown was responsible for accounting, while Marks performed marketing and consulting services. It was agreed that no one would receive compensation for his work. Bond estimated that the development of the technology would take up to six months and cost approximately $75,000 to $100,000.

Bond began to undertake the development and improvement of the Antaeus technology. After renting space for the business, and purchasing equipment and supplies, Bond determined that the Antaeus technology was not suitable for PolyCycle's needs without modification. One problem with the existing apparatus was that it did not recycle the water used in the process. Therefore, Bond added a hydrocyclone to the machine to recycle the water. Secondly, to improve the process, Bond replaced the Vaughan chopping pump with a Dicon mixing pump. Lastly, Bond modified the pressure vessels on the equipment to further aid the process.

In addition to modifying the equipment, Bond sought customers for PolyCycle. Specifically, Bond targeted the automobile industry. When Bond discussed the technology with potential customers, he required that they sign a confidentiality agreement, which stated that the technology belonged to PolyCycle.

As a result of a delay of more than two years and costs of approximately $500,000, meetings were held to review PolyCycle's progress. At one of these meetings, Bond requested a salary for his efforts, but Brown and Marks declined the request, citing PolyCycle's failure to generate a profit. Bond then consulted with an attorney and sought assistance in negotiating a compensation package. Bond's subsequent compensation demand upon PolyCycle merely resulted in further estrangement of the parties.

Bond also sought legal advice on whether his improvements to the technology were patentable. After conferring with his attorney, Bond believed that his modified process was not sufficiently different from the existing technology to warrant a patent. He testified, however, that he believed based on his attorneys' advice, that he was entitled to use any modifications of the Antaeus technology for which he was responsible, but that PolyCycle might have the right to use his modifications.

On September 23, 1997, Bond, through counsel, wrote to Marks and Brown and informed them that he had determined that the Antaeus technology was not commercially viable, but that he had developed an alternative technology that he believed was economically viable. Bond further stated that this alternative technology did not belong to PolyCycle, and contended that it belonged to him. The next day, on September 24, 1997, Bond resigned from PolyCycle as a director and officer. When Bond left, he took all of the technology with him, including computer files, papers, and records pertaining to the technology. In addition to taking the computer files, he deleted the files from PolyCycle's computers. In response, PolyCycle brought this suit, seeking to compel the return of, and restrict the use of, such information.

## DISCUSSION

Appellant contends that the trial court erred in finding that he willfully and maliciously violated the MUTSA. He also contends that the court placed an impermissible prior re-

straint on his right to free speech. Appellee asserts that the trial court did not err in its findings. We agree with appellee.

In reviewing the trial court's decision on the evidence, this Court will not reverse unless the decision was clearly erroneous. *See* Md. Rule 8–131(c). Maryland Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See also Operations Research, Inc. v. Davidson & Talbird, Inc.,* 241 Md. 550, 556, 217 A.2d 375 (1966).

## 1.

### Maryland Trade Secrets Act

The Maryland Uniform Trade Secrets Act (MUTSA) defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Code (1975, 1990 Repl.Vol.), § 11–1201 of the Commercial Law Article. The subject matter of a trade secret:

'may be an industrial secret like a secret machine, process, or formula, or it may be industrial know-how (an increasingly important ancillary of patented inventions); it may be information of any sort; it may be an idea of a scientific nature, or of a literary nature ... or it may be a slogan or suggestion for a method of advertising; lastly, the subject-

matter may be the product of work, or expenditure of money, or of trial and error, or the expenditure of time.' *Space Aero Prods. Co. v. R.E. Darling Co.*, 238 Md. 93, 105, 208 A.2d 74, *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965) (quoting Amedee E. Turner, *The Law of Trade Secrets* 4 (1962)).

Prior to the enactment of the MUTSA, the Court of Appeals adopted the factors for determining whether a trade secret exists as set forth in the Restatement of Torts. These factors are:

'(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'

*Id.* at 110, 208 A.2d 74 (quoting Restatement of Torts § 757 cmt. b (1939)). According to comment b of section 757 of the Restatement,

'[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating, or preserving materials, a pattern for a machine or other device, or a list of customers.'

*Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 782, 591 A.2d 578, *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991) (quoting Restatement of Torts § 757 cmt. b (1939)).

The Maryland statutory definition of a trade secret is "based on the Restatement comment," *id.* at 784, 591 A.2d 578, and we have held that although the Restatement factors are no longer a necessary part of the analysis, the "factors still provide helpful guidance to determine whether the information

in a given case constitutes 'trade secrets' within the definition of the statute." *Id.* "To the extent that the Restatement presents a narrower view, the [MUTSA] pre-empts that definition." *Id.* at 783, 591 A.2d 578.

In the present case, in determining whether the information was a trade secret, the trial court relied on the Restatement factors and made the following findings:

The extent to which the information is known outside the business. Well, in this case Antaeus went to great lengths to protect the information it had with regard to its process and the information developed by Mr. Bond as shown on the Defendant's Exhibit 19 was known only to him. He thought so much of it that he contacted a patent attorney although nothing came of it. But because it may not be patentable, it does not rule it out as a trade secret. He clearly thought highly of the information and sought to protect it.

Another factor is the extent to which it is known by employees and others involved in the business. The evidence that I have is that he's the only one that knows exactly how to do this. An inference from the facts is that I have heard in this case over the last few days is that there is more to it than just adding a different pump, a hydrocyclone and two vessels. There is the amount of water that is used, there is the amount of pressure that should be used, there is the temperature of the water, all of th[at] is information that is known only to Mr. Bond.

Another factor that one would consider is the extent of measures taken by the employer to guard the secrecy of the information. Mr. Bond, whenever he was discussing with potential customers the process, made certain that they signed confidential agreements. He also told me that he did not let anyone know the full extent of the process, including the ... potential employer for Mr. Bond. He told me that, and ... I find as a fact that [the potential employer] did not know the extent of the work done by Mr. Bond on the process.

Another factor is the value of the information to the employer and his competitors. Certainly there is a reasonable inference that this information is very valuable because again Mr. Bond went to some lengths to protect the company, from letting this information out to others without a confidentiality agreement.

The amount of effort or money expended by the employer in developing the information. Well, they have spent ... over half a million dollars, and Mr. Bond has expended one third of that. He has also expended a great deal of effort, which I said earlier is probably the prime reason why we find ourselves here today.

Another factor is the ease or difficulty with which the information could be properly acquired or duplicated by others.

So there are six factors, five [of] which I find are applicable here.

The sixth factor [is] the difficulty with which information could be properly acquired. It's clear that the equipment is easily acquired by others. Whether the process could be duplicated by others, the evidence is not fully clear because even as we sit here, and for good reason, Mr. Bond never has said exactly how the process would work....

But there ... are six factors which I apply to this process of evaluating whether or not the development of this process equals a trade secret, and I conclude as a matter of fact that it does.

Appellant contends that the trial court erred in finding this process to be a trade secret. His argument has two prongs: 1) the components of the machine are all available on the open market; and 2) the fundamental concept of breaking plastics into pieces and applying heated water and agitation is "widely known in the plastics industry." We find his argument flawed.

The availability of components in the open market is not dispositive. In *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 107 F.R.D. 288 (D.Del.1985), the United

States District Court for the District of Delaware analyzed "one of the best-kept trade secrets in the world": the complete formula for Coca–Cola. *Id.* at 289. The court explained that "although most of the ingredients are public knowledge, the ingredient that gives Coca–Cola its distinctive taste is a secret combination of flavoring oils and ingredients known as 'Merchandise 7X.' " *Id.* (citation omitted). The court further explained that it is the formula for Merchandise 7X that is tightly guarded. The formula for Merchandise 7X is only known by two persons within the Coca–Cola Company and the only written record of the formula is kept in a security vault at the Trust Company Bank in Atlanta, Georgia, which can only be opened via a resolution from the Board of Directors of Coca–Cola. *See id.*

Although the formula for the PolyCycle technology may not have been kept in a locked vault, only Bond knows the "secret formula" of how small to make the pieces of plastic, how much water to use, the appropriate temperature of the water, the proper level of agitation to apply, and the length of the agitation process. As appellee correctly points out, "[I]t is those elements, mixed and processed precisely in a certain manner, that define the PolyCycle process, just as much as the specific blend of . . . available ingredients defines Coca–Cola." Thus, we reject the first prong of appellant's argument.

■ *Head Ski Co. v. Kam Ski Co.,* 158 F.Supp. 919 (D.Md. 1958), is helpful in addressing the second prong of appellant's argument that the concept of applying heated water and agitation to pieces of broken plastic is widely known. Although *Head Ski* predates the enactment of MUTSA, it is persuasive authority. In this federal case, Head Ski Co. sought an injunction prohibiting Kam Ski Co. from using a certain manufacturing process for metal skis that the owners of Kam Ski Co. learned while employed at Head Ski Co.

Like appellant, Kam Ski Co. argued that the process it used to manufacture its skis was not Head Ski's trade secret because the process, methods, and materials it used were

known and used on the open market. The court rejected that argument and explained that Kam Ski Co. "overlooks the fact that a knowledge of the particular process, method or material which is most appropriate to achieve the desired result may itself be a trade secret. So may a knowledge of the best combination of processes, methods, tools and materials." *Id.* at 923. The court further reasoned:

> Similarly, although the materials used are available for purchase by anyone, the choice of a particular material was dictated by years of experimenting. Tests of a ski purchased on the open market would have disclosed many of the secrets, if one knew which tests were important. But the qualities for which one should test the materials are an important part of the secrets learned over the years. Defendants did not buy a Head ski on the open market and test the materials. They had learned while working for Head what materials he used, and where a test was necessary they tested material on which they had been working for Head.... 'It matters not that the defendants could have gained their knowledge from a study of the expired patent and the plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from the plaintiffs via the confidential relationship, and in so doing incurred a duty not to use it to the plaintiffs' detriment.'

*Id.* at 922–23 (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir.1953)).

For the same reasons enunciated in *Head Ski*, we reject appellant's contention that the PolyCycle technology is not a trade secret just because there are other technologies that utilize the application of heated water and agitation to broken pieces of plastic. Appellant's knowledge was not acquired by a general study of technologies available in the market place. Appellant acquired his knowledge when Marks and Brown offered him the opportunity to participate in the joint venture, and later, when acting as an agent for PolyCycle, he utilized PolyCycle's funds in the development process.

After considering all of the appropriate factors [1] identified in the Restatement, the trial court properly determined that the PolyCycle technology constituted a trade secret.

## II.

### Misappropriation of Trade Secret

■ Bond's second contention revolves around the timing of his resignation from PolyCycle.[2] Appellant argues that, because he resigned from his position as a director and president of PolyCycle on September 24, 1997, his subsequent appropriation of the computer files, drawings, etc., could not be enjoined because he no longer owed a duty to the corporation. Appellant is mistaken. It is undisputed that appellant embarked on the development of the recycling technology for the benefit of PolyCycle. As the trial judge stated:

The only corporate opportunity that Polycycle has is the commercialization of this process. . . . When negotiations broke down in September of 1997, Mr. Bond decided that he had had enough. . . . On the evening of September the 23 [rd] , prior to resigning, he took all the work product that he had done in the preceding two years on improving this process from the computer, placed it on a floppy disc, [sic] then erased it from the company computers. He then took the

---

1. Other factors listed in the Restatement were also properly applied by the trial court. As the trial court observed, appellant took precautions to guard the process to protect the commercial value associated with it. Further, a significant amount of money was exhausted in developing the process. The last factor, the difficulty with which the information could be properly acquired or duplicated, although considered by the court, was not accorded much significance.

2. Appellant also contends that the trial court erred in finding that he usurped a corporate opportunity from PolyCycle. We need not address this argument because we have found that the PolyCycle process was a trade secret, and an actual or threatened misappropriation of a trade secret may be enjoined. See CL § 11–1202. Section 11–1207 provides, with exceptions, that the MUTSA constitutes the exclusive remedy for civil claims based on misappropriation of trade secrets. Thus, a claim for usurpation of a corporate opportunity, if based solely on misappropriation of a trade secret, cannot survive once a remedy under the MUTSA is obtained. See CL § 11–1207(a)–(b)(1)(ii).

disc [sic] and it appears every other piece of paper within the corporation and went down the road with it.... Whether he did it on the 23 rd or the 25 th, I don't find of any moment in this case, and that is *because what he was appropriating was the trade secret that I find belonged to the company.*

(Emphasis added).

The trial judge was correct in finding that the date of appellant's resignation from his position as an officer was immaterial, because the recycling technology is the property of PolyCycle. *See Homer v. Crown Cork & Seal Co.*, 155 Md. 66, 78, 141 A. 425 (1928) (characterizing a trade secret as property of a corporation). The property of the corporation could not be appropriated by Bond simply because he resigned from his position as a director and officer a day earlier.

Trade secret law governs "the owner's entitlement to relief [from] harm, or potential harm, caused when his trade secret is taken by misappropriation." George J. Alexander, *Commercial Torts* 85 (2d ed.1988) (footnote omitted). As the Supreme Court explained:

The law ... protects the holder of a trade secret against disclosure or use when the knowledge is gained, not by the owner's volition, but by some 'improper means,' Restatement of Torts § 757(a), which may include theft, wiretapping, or even aerial reconnaissance. A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475–76, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974).

Under the MUTSA, misappropriation of a trade secret includes:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret; . . .

*See* CL § 11–1201(c); *see also Diamond v. T. Rowe Price Assocs.*, 852 F.Supp. 372, 412 (D.Md.1994) (holding that, "In order to qualify as misappropriation under MUTSA, one must either acquire the trade secret by improper means or disclose the trade secret without express or implied consent."). Appellant did not have either express or implied consent to disclose PolyCycle's process, or authority to abscond with PolyCycle's trade secret and use it for his own benefit after he resigned. A trade secret "constitute[s] a part of the assets . . ." of a corporation and as "property of the . . . Corporation, . . . [no] unauthorized person, firm, or corporation has any right to make use of them." *Homer*, 155 Md. at 78–79, 141 A. 425. Without authority from PolyCycle, appellant's taking of its computer files relating to the process constituted a theft, and therefore a misappropriation under CL § 11–1201. *See* CL § 11–1201(b).

Moreover, "[a]s a general rule, a former employee is obligated not to disclose or use the confidential information acquired during his employment." *Alexander, supra*, at 102–03; *see also Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 38, 382 A.2d 564 (1978); *Inflight Newspapers, Inc. v. Magazines In-Flight LLC*, 990 F.Supp. 119, 137 (E.D.N.Y.1997); Restatement (Second) of Agency § 396(b) (1994).[3]

---

**3.** The Restatement (Second) of Agency § 396(b) provides in pertinent part:

Using Confidential Information After Termination of Agency.

Unless otherwise agreed, after the termination of the agency, the agent: . . .

(b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of

Accordingly, the trial court did not err in failing to find a specific date of resignation. In light of the trial court's determination that the technology was a trade secret, knowledge of which Bond acquired while employed at PolyCycle, his date of resignation is not material.

## III.

### Attorneys' Fees

■ Appellant next contends that the trial judge erred in finding that he willfully and maliciously violated the MUTSA. In an action involving trade secret misappropriation, the court may award attorneys' fees to the prevailing party if the misappropriation was willful and malicious. Section 11–1204 of the Commercial Law Article provides:

The court may award reasonable attorney's fees to the prevailing party if:

(1) A claim of misappropriation is made in bad faith;

(2) A motion to terminate an injunction is made or resisted in bad faith; or

(3) Willful and malicious misappropriation exists.

At the conclusion of a hearing on July 10, 1998, the trial judge signed an order stating his finding that:

Mr. Bond's taking of the trade secrets of PolyCycle Corporation, coupled with his intentional acts of deleting all of the files from PolyCycle's computers and his taking of the PolyCycle files and records was willful and malicious and meets the standards of [section 11–1204]. . . .

Appellant challenges this finding in two respects. First, he argues that he was entitled to take the technology with him when he resigned. We rejected this argument in Sections I and II of this opinion. Second, appellant argues that, because he acted on the good faith advice of his counsel, he was not acting willfully and maliciously.

---

names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty.

We first observe that appellant did not merely take his knowledge of the technology with him. Rather, he intentionally deleted the information from PolyCycle's computers and removed all traces of the technology from PolyCycle's offices. It is this latter act that substantiates the trial judge's finding of willful and malicious conduct.

This Court discussed willful conduct in *Pacific Mortgage and Inv. Group, Ltd. v. Horn,* 100 Md.App. 311, 641 A.2d 913 (1994). There, a borrower filed an action against a lender for an alleged violation of the law pertaining to charging points for a loan. The lender argued that its actions were not willful because it did not realize that the loan was governed by a statute. As a result, it argued that it could not have violated a known legal duty. In our discussion, we defined "willfully" as follows:

> In a civil action, the word [willfully] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal context it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful or conduct marked by a careless disregard whether or not one has the right so to act.

*Id.* at 332–33, 641 A.2d 913 (citing *Black's Law Dictionary* 1600 (6th ed.1990)). We found that the lender willfully violated a statute and reasoned:

> Pacific does not dispute the fact that it intentionally, knowingly and voluntarily charged points on this loan; it admits it and argues it was proper. We earlier held that state law was not preempted as to this loan. Therefore, by charging points on the loan, Pacific violated § 12–306(d) [of the Commercial Law Article], which provides that a lender 'may not contract for, charge, or receive interest in advance....' Pacific did not accidently charge points on this

loan; it intentionally, knowingly, and voluntarily charged points. Thus, Pacific acted willfully.

*Id.* at 333, 641 A.2d 913.

In the present case, it is undisputed that appellant took files from PolyCycle and deleted files from its computers. This act was knowing, voluntary, and intentional. As made clear in *Pacific,* it matters not that appellant believed that he was entitled to take the technology. Thus, we conclude that appellant acted willfully.

■ Our next inquiry is whether appellant's actions were malicious. Malice is "the intentional doing of a wrongful act without legal justification or excuse. An act is malicious if it is done knowingly and deliberately, for an improper motive and without legal justification." *Elliott v. Kupferman,* 58 Md.App. 510, 526, 473 A.2d 960 (1984). The purpose of the alleged malicious act must be to deliberately cause harm or injury. *See Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 519, 366 A.2d 1 (1976).

Again, our focus is not on appellant's taking of property, but on the deletion of the files from PolyCycle's computers. The deletion of the computer files could have no other effect than to strip PolyCycle of important information regarding the technology. This act intentionally, willfully, and purposefully harms PolyCycle by interfering with or preventing its continuing with its stated corporate purpose. Judge Byrnes found that actual malice was present:

THE COURT: There was all the ill will you could ever hope for.

[DEFENSE COUNSEL]: I don't know about that.

THE COURT: I do. I sat here and took testimony so I can tell you he had ill will toward them. So the record is clear, Mr. Bond had ill will—... toward PolyCycle, to his partners.... He had ill will. He was mad at them, he was angry with them because he thought they were treating him unfairly.

Upon our review of the record, we cannot find that this finding was clearly erroneous.

■ An attorney's advice may be relevant to a determination of a person's malicious intent. *See Brashears v. Collison,* 207 Md. 339, 350, 115 A.2d 289 (1955); *see also VF Corp. v. Wrexham Aviation Corp.,* 350 Md. 693, 713–14, 715 A.2d 188 (1998); *Derby v. Jenkins,* 32 Md.App. 386, 391, 363 A.2d 967 (1976) (holding that reliance on an attorney's advice may, in a civil action, negate wrongdoing where the advice has been based on a full disclosure of the relevant facts). Bond's attorneys, however, did not advise him that he had the right to delete the technological information from PolyCycle's computers. Rather, as Bond admitted, his attorneys advised him that he and PolyCycle might *both* have rights to use the technology. Such advice cannot justify or mitigate Bond's unilateral, surreptitious, and unauthorized removal of the information from PolyCycle's computers.

We hold that the award of attorneys' fees was proper.

## IV.

### Right to Free Speech

■ Appellant also challenges the validity of Judge Byrnes's order on constitutional First Amendment grounds. He argues that the order constitutes an impermissible prior restraint, which interferes with his First Amendment right to free speech under the United States Constitution. Specifically, he contends that the order "constitutes a time restriction on [his] ability to communicate with others concerning the technology." As a result, he asserts that the order is "facially unconstitutional as it is overbroad and impermissible."

We decline to address this issue. As appellant acknowledged at oral argument, this constitutional challenge was not raised below. Thus, it will not be decided by this Court. *See* Md. Rule 8–131; *Mayor of Baltimore v. Dembo, Inc.,* 123 Md.App. 527, 544, 719 A.2d 1007 (1998) (declining to address a First Amendment constitutional issue that was not raised in

the lower court); *Hall v. State,* 22 Md.App. 240, 245–46, 323 A.2d 435 (1974) (declining to address a constitutional issue raised for the first time on appeal).

## V.

### Appellee's Request for Attorneys' Fees

 Lastly, PolyCycle requests an award of attorneys' fees for the expenses incurred in successfully defending this appeal. Appellee argues that the statutory remedy of section 11–1204 of the Commercial Law Article is not limited to the trial court level. We agree.

Where one is found to have willfully and maliciously misappropriated a trade secret from another, section 11–1204 allows the injured party to be awarded attorneys' fees incurred in redressing that violation. PolyCycle not only incurred legal expenses at the trial level, but also during this appeal.

In *Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 698 A.2d 1167, *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997), this Court analyzed a party's request for attorneys' fees incurred in a contested insurance coverage case. We held that the insured was entitled to appellate litigation fees and explained that "[n]one of the case law establishing the entitlement of an insured to the attorneys' fees incurred in establishing coverage suggests any distinction between litigation at the trial level and litigation at the appellate level." *Id.* at 714, 698 A.2d 1167. Further, we stated that, with regard to contested coverage claims, the entitlement of attorneys' fees is not to be measured "on an inning-by-inning basis, but only at the end of the entire game. For the moment at least, the filing by the Court of this opinion is the end of the game and [PolyCycle] has emerged as the prevailing party." *Id.* at 715, 698 A.2d 1167. The attorneys' fees and expenses PolyCycle incurred in connection with this litigation were directly related to Bond's willful and malicious conduct. Accordingly, we find that PolyCycle is entitled to reasonable attorneys' fees and remand the case to the trial court so that it may determine and assess those fees and

expenses incurred by PolyCycle during the proceedings with this Court. *See Nolt v. United States Fidelity and Guar. Co.,* 329 Md. 52, 68, 617 A.2d 578 (1993).

**JUDGMENT AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLANT.**